RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0127P (6th Cir.)
File Name: 03a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JEFFREY M. THACKER;
JESSICA GALLAGHER,
    *Plaintiffs-Appellants,*

    *v.*

CITY OF COLUMBUS; DICK
GUSTAVO ELIAS, RONALD G.
BOSLEY, and STEVEN R.
STACK, individually and in
their capacity as Columbus
Division of Police; JEFFREY
M. WENTWORTH, individually
and in his capacity as an
agent, employee, or
representative of the City Of
Columbus Division of Fire,
    *Defendants-Appellees.*

No. 01-4097

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00561—Edmund A. Sargus, Jr., District Judge.

Argued: March 14, 2003

Decided and Filed: April 30, 2003

---

2    *Thacker, et al. v. City of Columbus, et al.*  No. 01-4097

Before: COLE, GILMAN, and BRIGHT, Circuit Judges.[*]

———————————

## COUNSEL

**ARGUED:** James D. McNamara, Columbus, Ohio, for Appellants. Jeffrey S. Furbee, COLUMBUS CITY ATTORNEY'S OFFICE, DEPARTMENT OF LAW, Columbus, Ohio, for Appellees. **ON BRIEF:** James D. McNamara, Columbus, Ohio, Anthony O. Mancuso, Gahanna, Ohio, for Appellants. Jeffrey S. Furbee, Gordon Bradley Hummel, COLUMBUS CITY ATTORNEY'S OFFICE, DEPARTMENT OF LAW, Columbus, Ohio, for Appellees.

———————————

## OPINION

———————————

R. GUY COLE, JR., Circuit Judge. Plaintiffs Jeffrey Thacker and Jessica Gallagher appeal the district court's grant of summary judgment in favor of defendants, three police officers, Sergeant Ronald Bosley, and Officers Dick Elias and Steven Stack, and a paramedic, Jeffrey Wentworth, all employed by the City of Columbus, Ohio. Plaintiffs brought this civil rights action after defendants came to their home in response to a 911 call reporting an injury to Thacker, and, ultimately, arrested Thacker for a domestic violence offense. Plaintiffs assert that defendants violated their Fourth Amendment rights and state tort law by unlawfully entering their home, handcuffing Gallagher, and arresting and prosecuting Thacker. Because plaintiffs cannot demonstrate that a constitutional violation occurred, and, in any event, because defendants are entitled to qualified immunity for their actions, we AFFIRM the judgment of the district court.

———————————

[*]The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## I.    BACKGROUND

### A.    Factual History

On September 5, 1998, Jessica Gallagher and her live-in fiancee, Jeffrey Thacker, went out drinking with friends and were driven home after having a number of alcoholic drinks. Gallagher and Thacker were probably intoxicated when they arrived home and Thacker continued to drink. According to Thacker, once at home, he dropped a beer bottle on the kitchen floor, slipped, and fell on the broken bottle, cutting his wrist. Upon discovering that Thacker had been cut and had blood on his hands, legs, and boxer shorts, Gallagher called 911. The following exchange took place between Gallagher and the 911 dispatcher:

Dispatcher: 911. What is your emergency?

Gallagher: Well, uh, my emergency is, um, somebody here at 2035 ...

D: What's the emergency?

G: The emergency is he is cut.

D: What?

G: He is cut. And he's bleeding.

D:  How'd he get cut?

G: Um, I don't know.

D: Did he get in a fight? Did he cut his own wrists, or what, what's the story?

G: I think I .  . . I don't know. [sounds like crying]

D: Ok. He's cut.

G: He, my fiancee is cut.

D: Where?

G: I don't know . . . . Jeff, where you cut? [unintelligible voice in background] His wrist.

D: So, he cut his wrists?

G: No, he didn't.  [tell her (unintelligible)]

D: Is it one wrist, or two?

G: It, it, its [sic] one.

D: One. Ask him how it, how it happened.

G:  Jeff. [yes?] Jeff, how'd your wrist get cut? [well I was ...] Jeff, [yeah] Jeff, how's your [unintelligible] Jeff. I don't know.  He won't answer me.

At approximately 4:00 a.m., Columbus paramedics Curtis Kaiser and Jeffrey Wentworth were dispatched to Thacker and Gallagher's residence to attend to an incident labeled by the dispatcher as an attempted suicide. Officers Dick Elias and Steven Stack of the Columbus Police Department were dispatched to the same location on a Code 10-14, which refers to either a cutting or stabbing. Code 10-14 is a high priority code that indicates that the injured person may be the victim of a crime, and requires that at least two officers respond. The paramedics arrived first, but waited outside for the police officers to arrive and secure the scene.

When Officers Elias and Stack arrived, they knocked on the apartment door. Thacker and Gallagher answered. When the front door was opened, the officers noticed that there was broken glass on the kitchen floor and an indentation in one wall with a liquid stain beneath it. Thacker's hand was bleeding profusely, and he was bloodied. Visibly intoxicated and immediately belligerent, Thacker used profanity as he spoke to the officers. Without explaining the cause of his injury, Thacker exclaimed that he had called for the paramedics–not the police.  Thacker then invited the

paramedics, but not the police officers, to "[c]ome on in" to the apartment. At no time did Thacker give Elias and Stack permission to enter the home, although he also did not expressly prohibit the officers from entering either.

After this initial exchange, the officers concluded that Thacker was not a reliable source of information and entered the apartment to investigate a possible crime, assist Thacker and any other injured persons, and determine whether it was safe for the paramedics to enter the apartment. Once inside, although the officers still were unsure precisely how Thacker had been injured, they determined that Thacker and Gallagher were the only people present in the apartment, Thacker needed medical attention, and it was safe for the paramedics to enter as long as the officers remained in the apartment.

Officer Elias signaled for the paramedics to enter the apartment, and they entered and began treating Thacker. Officers Elias and Stack remained in the apartment for the safety of the paramedics because this was their general practice, and because Thacker, who was still intoxicated, acted alternately belligerently and cooperatively. Kaiser determined that Thacker needed stitches and offered to transport him to the hospital. Thacker refused.

While Thacker was being treated, Officer Elias noticed that Gallagher had a bruise on her right upper arm and mentioned it. Officer Stack and paramedics Kaiser and Wentworth then noticed the bruising, which was on Gallagher's legs as well. The paramedics described the bruises as recent or "fresh."

At first Gallagher told the officers that she received the bruises when she fell out of bed. At the officers' request, Gallagher showed them her bed, which was only a mattress on the floor. At this point, Gallagher explained that she received the bruises when she tripped over the bed and fell into a dresser. Later that night, Gallagher again changed her explanation for the bruising, telling the officers that some of the bruises were the result of a fall on the front steps to the apartment.

Officer Stack claims that he and Gallagher then spoke outside the apartment, and Gallagher confessed to him that Thacker had struck her a week earlier, causing the bruises. Thereafter, the paramedics questioned Gallagher about the bruises. During this questioning, both Wentworth and Kaiser noted that Gallagher was apprehensive about answering Wentworth's questions in Thacker's presence. Accordingly, Wentworth brought Gallagher, willingly, to the paramedics' van so that he could inspect her bruises. Inside the van, Wentworth questioned Gallagher about the bruises. He claims that, ultimately, she told him that "she deserved it—that she and Mr. Thacker had gotten into an argument, that she made him mad, and that he started hitting and kicking her." After speaking with Gallagher, Wentworth told Elias that Gallagher had admitted that Thacker had beaten her.

At approximately 4:30 a.m., after receiving this information, Elias contacted his supervisor, Sergeant Bosley, who came to the scene. Officer Stack testified that he informed Bosley that Gallagher had told himself and Wentworth that Thacker had caused the bruises on her body.

Upon his arrival, Bosley spoke with Thacker, who, Bosley claims, explained that he had been arguing with Gallagher but had not struck her. Bosley then spoke with Gallagher inside the apartment, but, when Thacker repeatedly interrupted the conversation, they finished the conversation outside. Bosley described the exchange as follows:

> [S]he and Mr. Thacker had gone out, they had both been drinking, they argued, and Mr. Thacker threw a beer bottle at her. At first, Ms. Gallagher told me that she got the bruises falling out of bed. Ms. Gallagher was nervous and shaking. I told her that the bruises looked as if they were the result of an assault, that if she had been assaulted, she needed to tell me the truth, that otherwise she could be obstructing justice, and that her safety was our first and foremost concern. Ms. Gallagher then said that Thacker had hit her.

Gallagher maintains that she never stated to anyone that Thacker had struck her or caused the bruises.

Sergeant Bosley directed Elias and Stack to arrest Thacker for domestic violence. Officers Elias and Stack placed Thacker under arrest for domestic violence and assault. The officers photographed Gallagher's bruises. Elias then telephoned Gallagher's father and told him that Thacker had been arrested for domestic violence. Stack then completed a police report.

Although Gallagher claims that the officers handcuffed her for approximately one minute so that they could photograph her bruises, each of the defendants testified that Gallagher was never handcuffed. Gallagher also claims that the officers were yelling and cursing at her and threatening her with arrest if she did not cooperate. Thacker claims that the officers cursed at him when they first entered the apartment. However, the officers testified that they did not swear at Thacker or Gallagher. None of the officers or paramedics had prior contact with or knowledge of the plaintiffs.

On September 5, 1998, two criminal complaints were filed against Thacker charging him with domestic violence and assault. Thacker was held in jail for approximately three days. However, the charges against him were dismissed on October 28, 1998, after Gallagher refused to cooperate with the prosecution. Gallagher was never arrested or prosecuted in connection with this incident.

### B. Procedural History

Thacker and Gallagher filed a complaint alleging constitutional and state law torts against the City of Columbus; Columbus police officers Elias, Stack, Bosley, Rick Newpoff, Marvin Rapenport, and Susan Hill: and paramedics Kaiser and Wentworth. Subsequently, Hill, Newpoff, and Davenport were dismissed as defendants.

On January 17, 2001, plaintiffs moved for summary judgment on their Fourth Amendment claims for unlawful

entry and seizure and related state law claims. On May 31, 2001, defendants Elias, Stack, Bosley, Kaiser, Wentworth, and the City of Columbus filed a cross-motion for summary judgment seeking judgment as a matter of law on all of plaintiffs' claims, and qualified immunity with respect to plaintiffs' Fourth Amendment claims. Thereafter, the City of Columbus and Kaiser were dismissed from the case leaving, as the only remaining defendants, Elias, Stack, Bosley and Wentworth.

On July 23, 2001, plaintiffs moved for leave to amend the complaint to state a claim based upon the warrantless entry into their apartment as a violation of the Fourth Amendment. Plaintiffs then dismissed all claims except their: (1) § 1983 claim for unlawful entry in violation of the Fourth Amendment; (2) § 1983 claim for unlawful arrest and malicious prosecution of Thacker in violation of the Fourth Amendment; (3) § 1983 claim for unlawful seizure of Gallagher in violation of the Fourth Amendment; and (4) state tort claims for false arrest of Thacker and Gallagher and for malicious prosecution of Thacker.

On August 27, 2001, the district court issued an opinion and order denying plaintiffs' motion for leave to amend the complaint, but construing the warrantless entry claim as properly pled. The district court granted defendants' cross-motion for summary judgment, and denied plaintiffs' motion for summary judgment. This appeal followed.

### II. ANALYSIS

We review the district court's decision to grant summary judgment *de novo* and apply the same standard the district court applied. *Fridley v. Horrighs*, 291 F.3d 867, 871 (6th Cir. 2002). A grant of summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a material fact will only be genuine if "a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, courts are required to view all facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A. Fourth Amendment Unlawful Entry Claim

### 1. Pleadings

On appeal, defendants claim that this Court should dismiss plaintiffs' Fourth Amendment unlawful entry claim because plaintiffs failed to plead this claim sufficiently. In its August 27, 2001 decision, the district court refused leave to amend on the grounds that amendment would be futile because exigent circumstances justified defendants' entry. However, the district court construed the complaint as having sufficiently pled a claim for unlawful entry, finding the allegations in the complaint "minimally sufficient" to support such a claim. We review the district court's decision for abuse of discretion. *Tefft v. Steward*, 689 F.2d 637, 638 (6th Cir. 1982).

Upon a plaintiff's request for leave to amend the complaint, a district court is obliged to give leave freely "when justice so requires." *See* FED. R. CIV. P. 15(a); *Tefft*, 689 F.2d at 639. This Court has explained that Federal Rule of Civil Procedure 15 is intended to reinforce the principle that cases should be decided on their merits and not merely upon the technicalities of the pleadings. *Tefft*, 689 F.2d at 639 (citing *Conley v. Gibson*, 355 U.S. 41, 48 (1957)).

As the district court found, the complaint alleges that defendants "appeared at the subject residence" and that "[t]he wrongful and malicious acts by Defendants, Elias, Bosley, Stack, . . . [and] Wentworth . . . deprived Plaintiffs . . . of their liberties and rights as guaranteed by the Constitutions of the United States and State of Ohio." The parties also conducted discovery on the unlawful entry claim, putting defendants on notice that plaintiffs were asserting such a claim. For these factual reasons, and because of our preference for deciding

cases on the merits, we find that the district court did not abuse its discretion in finding the pleadings to be sufficient.

### 2. Merits of Unlawful Entry Claim

The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585 (1980). The Fourth Amendment requires that searches of the home be reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). This reasonableness requirement generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home. *See Payton*, 445 U.S. at 585-86. However, there are a few well-defined and carefully circumscribed circumstances in which a warrant will not be required. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978); *see also United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).

In this case, it is undisputed that defendants entered plaintiffs' home without a warrant in response to a 911 call placed from the home. The Fourth Amendment prohibition against entering a home without a warrant applies equally whether the police enter a home to conduct a search or seizure or for some other purpose. *See United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996). Thus, unless the circumstances of this case fall into one of the exceptions to the warrant requirement, the Fourth Amendment will have been violated.

In this case, we are called upon to address whether the "exigent circumstances" exception to the warrant requirement justified defendants' entry into plaintiffs' home. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002).[1]

---

[1] Another exception to the prohibition on entering a home without a warrant is made where "voluntary consent is given to the search by the owner of the home or property" or by someone with apparent authority to consent. *United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003). However, the parties have not appealed the district court's decision that

Exigent circumstances are situations where "'real immediate and serious consequences'" will "certainly occur" if the police officer postpones action to obtain a warrant. *Id.* (quoting *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984))). This Court has explained that the following four situations may give rise to exigent circumstances: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Johnson*, 22 F.3d at 680; *see Minnesota v. Olsen*, 495 U.S. 91, 100 (1990).

Defendants contend that the warrantless entry into plaintiffs' home at issue here presents the fourth situation. In particular, defendants argue that they were required to determine whether anything or anyone in plaintiffs' home posed a risk of danger either to themselves or to the paramedics who sought to enter the home to attend to the injured, or, alternatively, to someone inside the home. This Court has explained that the "'risk of danger' exigency" most frequently justifies "warrantless entries in cases where the Government is acting in something other than a traditional law enforcement capacity." *Rohrig*, 98 F.3d at 1515; *see, e.g., Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (finding warrantless entry into a burning building was justified); *Johnson*, 22 F.3d at 680 (finding limited warrantless entry was justified to free a victim who had been held against her will and sexually assaulted).

"[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392. Police have a right and a duty to respond to emergency situations. The encounter in this case was triggered by a 911 call reporting an

---

plaintiffs did not consent to defendants' entry into their apartment. Therefore, we do not have occasion to address the question of consent.

emergency, which was labeled by the dispatcher as relating to a "cutting or stabbing."

Some courts have found that, under certain circumstances, a 911 call reporting an emergency, without more, may be enough to support a warrantless search of a home. *See, e.g., United States v. Cunningham*, 133 F.3d 1070, 1072-73 (8th Cir. 1998) (finding 911 call from woman who identified herself and claimed that she was being held against her will justified protective sweep of dwelling); *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) (concluding that a 911 call where the caller identified himself and stated that "Lucky" had raped and murdered a woman whose body could be found in the basement of a particular address was enough to support a warrantless search under the exigent circumstances exception). Although we have not previously held that a 911 call alone may justify a warrantless entry into a private home, we need not and do not reach such a conclusion here.

When the officers arrived at plaintiffs' residence, their observations and the need to safeguard the paramedics supported the conclusion that there existed exigent circumstances, justifying entry into plaintiffs' home without a warrant. *See Ewolski*, 287 F.3d at 503-05. In particular, the totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation, justified entry to secure the safety of the police, paramedics, and other people possibly inside the home.[2]

---

[2] Gallagher's 911 call reporting an emergency, justified a police response to investigate the situation further, but did not necessarily justify entry into a private home. *See United States v. Meixner*, 2000 WL 1597736, at *8 (E.D. Mich. Oct. 26, 2000) (concluding even a 911 hang-up call coded as a possible domestic violence situation justified only a limited response). Only when the police arrived at the home and observed facts indicative of exigent circumstances, were they justified in entering the home. We make no determination that exigent circumstances necessarily arise every time both a police officer and a paramedic respond to a cutting or stabbing.

Viewing the facts in the record in the light most favorable to plaintiffs, the following information was available to the officers before they entered plaintiffs' apartment. Someone had placed a 911 call reporting an emergency–a cutting or stabbing–at the residence. Thacker answered the door shirtless, with blood on his legs and boxer shorts. It was apparent that Thacker himself was injured, as the officers could see that he was bleeding from a cut on his hand. The cut was deep enough to require stitches, but Thacker had wrapped his shirt around his hand to slow the profuse bleeding. Immediately, Thacker acted belligerently and used profanity. He appeared intoxicated. Thacker failed to provide any explanation for the injury. Instead, he demanded assistance from the paramedics, who were waiting outside for the officers to tell them that it was safe to enter. "When the door was opened," Officer Stack could see the kitchen area, including the kitchen table, to the right and the main living room area to the left. In the kitchen, he could see a broken beer bottle on the floor, a hole in the kitchen wall a "couple feet off the floor," and liquid splashed on the wall and spilled on the floor. The officers did not see Gallagher until they were already crossing the threshold to enter the apartment, at which point Thacker left the doorway to sit at the kitchen table.

Although it presents a close question, the uncertainty of the situation, in particular, of the nature of the emergency, and the dual needs of safeguarding the paramedics while tending to Thacker's injury, created exigent circumstances here. The 911 call in this case reported a cutting or stabbing. Such an emergency call requires a police and paramedic response and potentially involves serious peril to the officers, paramedics, or others. The call solicited a response from an emergency team. Although this does not amount to consent justifying the search, it clearly weighs in favor of finding that plaintiffs' expectation of privacy in their home was diminished. The officers were placed in a difficult position in that they were duty-bound to respond to Thacker's request for assistance, but also rebuffed when they attempted to do so.

The safety of the paramedics and others in this case also must be considered. The officers had to secure the safety of the paramedics before the paramedics could attend to Thacker. Thacker did not explain his injury or anything else to the police while they were on the porch. His demeanor and attitude indicated that Thacker could have posed a threat to the safety of the officers or paramedics. Moreover, it was not clear who else was in the apartment and, therefore, whether any others might either pose a threat or be in danger. The officers could see broken glass and a hole in the kitchen wall. This observation made it unclear whether an altercation or an accident had occurred. These facts created uncertainty that, given Thacker's lack of cooperation, could only be dispelled by entering the home and investigating further. Finally, there was no opportunity to obtain a warrant before administering medical aid to Thacker, who was obviously seriously injured. *Cf. Johnson*, 22 F.3d at 680 (finding police had "ample time" after freeing sexual assault victim who had been held against her will to secure a warrant before further searching the home in which she had been held).

Thus, the potential dangers attendant to a cutting or stabbing call, the fact that plaintiffs' solicited the response they received, the need to safeguard the paramedics and others, including creating a safe environment and figuring out what happened, and the need to act swiftly to tend to Thacker's injury justified the entry in this case.[3]

### B.   Fourth Amendment Unlawful Seizure Claims

The Fourth Amendment states in pertinent part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "[I]t is well established that any arrest

---

[3]The unlawful entry claim against defendant Wentworth, a paramedic, cannot survive summary judgment. Wentworth entered the apartment with Thacker's consent to treat Thacker's injuries. As such, Wentworth's entry into plaintiffs' home was justified.

without probable cause violates the Fourth Amendment." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). For probable cause to arrest to exist, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Id.* (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (citing *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). Whether there exists a probability of criminal activity is assessed under a reasonableness standard based on "'an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest.*'" *Crockett*, 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)). The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible. *Id.* at 581; *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

### 1.   Plaintiff Thacker

Thacker was arrested for domestic violence pursuant to Ohio Revised Code § 2919.25(A). Section 2919.25(A) states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Under the statute, a "household member" includes "[a]ny of the following who is residing or has resided with the offender," a "spouse, a person living as a spouse, or a former spouse of the offender." OHIO REV. CODE § 2919.25(E). A

> 'person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

*Id.* Ohio has a preferred arrest policy in domestic violence situations. In particular, Ohio law provides that where a peace officer has "reasonable grounds to believe that the

offense of domestic violence . . . has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person." OHIO REV. CODE § 2935.03(B)(3)(b); *see Scott v. City of Bexley*, 11 Fed. Appx. 514, 517 (6th Cir. 2000) (unpub'd).

"The Fourth Amendment does not require that a police officer *know* a crime occurred at the time the officer arrests or searches a suspect . . . . The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Thus, for probable cause to arrest Thacker to exist here, the officers would not have to have proof of each element of a domestic violence offense, but would have to believe that a probability existed that he committed the offense.

At the time Sergeant Bosley ordered Officers Elias and Stack to arrest Thacker, the following information had been gathered collectively by the officers on the scene and shared. *See Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("Probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest"). Thacker and Gallagher lived together. That night, the pair drank to the point at which Thacker was probably intoxicated and then argued. Plaintiffs' shared apartment was in disarray. The mess in the apartment included a broken bottle that appeared to have shattered when thrown against a wall of the kitchen. Thacker acted belligerently. Gallagher had severe bruises on her body that were anywhere from a week to a few days old. Thacker interrupted Gallagher when she tried to respond to defendants' questions about how she received her bruises. Gallagher also appeared nervous discussing the bruises in front of Thacker,[4] and was evasive in answering the officers'

---

[4] The paramedics believed that Gallagher was nervous discussing the bruises around Thacker. However, there is no direct evidence that this belief was conveyed to the arresting officers and, thus, relied upon in making the determination that probable cause existed. Nevertheless, there

questions about her bruises. The officers did not believe they could reconcile Gallagher's thrice-changing explanations for the bruises with the severity and locations of the bruises. Finally, there is evidence that Sergeant Bosley was told that Gallagher confessed that Thacker had caused the bruises on her body. Although Gallagher claims that she never made such a confession, the evidence demonstrates at a minimum that Wentworth told Elias that she had confessed to him, and that Bosley reasonably relied upon this information in determining that probable cause to arrest Thacker for a domestic violence offense existed.[5]

Gallagher's confession that Thacker had abused her alone is sufficient to establish probable cause. *See Klein v. Long*, 275 F.3d 544, 551-52 (6th Cir. 2001) (explaining officers need not interview an alleged offender where a victim claims that she was abused if such an interview would, at most, produce an exculpatory denial of wrongdoing), *cert. denied*, 123 S. Ct. 95 (2002); *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) ("[A victim's] accusation that she had been sexually assaulted by the plaintiff, standing alone, was sufficient to establish probable cause."). However, even crediting Gallagher's statement that she never confessed at all, the totality of the facts and circumstances known to the

---

is strong circumstantial evidence supporting the conclusion that the police officers were aware that Gallagher was nervous when questioned in front of Thacker. First, the officers were present when Wentworth questioned Gallagher in front of Thacker. Moreover, Elias knew Wentworth took Gallagher to the paramedics' van to separate her from Thacker. Finally, the officers themselves separated plaintiffs to talk to them individually. Thus, the record supports the inference that the officers either knew of the paramedics' belief or formed a similar belief independently.

[5] Plaintiffs "hotly" contest certain facts in their brief to this Court. In particular, plaintiffs contest that Thacker admitted he argued with Gallagher on the evening in question and that Gallagher was nervous and evasive. However, plaintiffs have failed to provide any admissible evidence whatsoever to support these contentions. No jury could reasonably find that plaintiffs had proved these facts. *See Liberty Lobby, Inc.*, 477 U.S. at 252.

officers collectively provided probable cause to arrest Thacker for domestic violence.[6] The behavior of Gallagher and Thacker, information that the pair had argued that night, the broken bottle and disarray of the apartment, Gallagher's bruises and her oft-changing story, combined with Ohio's preferred arrest policy appear, at least minimally, to support a finding of probable cause.

## 2.   Plaintiff Gallagher

Gallagher claims that she was unconstitutionally detained in violation of the Fourth Amendment when the officers handcuffed her for one minute while she was inside the paramedics' van in order to photograph her bruises. Gallagher has failed to clearly identify which defendant handcuffed her. Defendants testified that at no time was Gallagher handcuffed. The Fourth Amendment is implicated when an individual's freedom to leave is restricted. *Dunaway v. New York*, 442 U.S. 200, 207 n.6 (1979); *cf. Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002). Gallagher is required to show not only that there was a seizure, but also that it was unreasonable under the Fourth Amendment. *See Burchett*, 310 F.3d at 945. Gallagher identified the defendant who handcuffed her as a white male who was not Bosley and "probably" was not Elias. Because, without more, no reasonable jury could find for her on this claim, summary judgment is appropriate. Even assuming that a jury would credit Gallagher's testimony that she had been handcuffed over the testimony of the officers and paramedics that she was not, Gallagher would still be unable to prove which defendant had violated her rights.

Gallagher also claims that the officers threatened her with arrest if she did not cooperate, and yelled at her. The officers

---

[6] Notably, Bosley directed that Thacker be arrested, and Elias carried out Bosley's orders, while Stack wrote a police report. Summary judgment is appropriate on the unlawful entry and unlawful seizure claims insofar as these claims are alleged against Wentworth, who did not participate in the arrest.

testified that they did not swear at Thacker or Gallagher. Assuming that this factual dispute is genuine, we find it immaterial because threats alone cannot support a constitutional claim. *See Emmons v. McLaughlin*, 874 F.2d 351, 353-54 (6th Cir. 1989).

### C.    Malicious Prosecution Claims

In *Albright v. Oliver*, 510 U.S. 266 (1994), a plurality of the Supreme Court concluded that the substantive component of the Fourteenth Amendment's Due Process Clause "with its scarce and open-ended guideposts" may not give rise to a federal constitutional malicious prosecution claim. *Id.* at 275. However, the *Albright* Court explained that the Fourth Amendment, which governs "deprivations of liberty that go hand in hand with criminal prosecutions[,]" would be relevant to such a claim. *Id.* at 273-74 ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."). Ultimately, the *Albright* Court refused to address whether the Fourth Amendment had been violated in that particular case because the plaintiff had not properly raised the issue.

After the Supreme Court's decision in *Albright*, this Court recognized a federal claim of malicious prosecution under the Fourth Amendment where plaintiffs alleged that defendants wrongfully investigated, prosecuted, convicted, and incarcerated them. *Spurlock v. Satterfield*, 167 F.3d 995, 1005-07 (6th Cir. 1999) (finding "malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment").

However, in *Frantz v. Village of Bradford*, this Court apparently disregarded *Spurlock*'s holding when it held that "in cases *based on alleged Fourth Amendment violations*, plaintiffs do not have a separate § 1983 claim for malicious prosecution." 245 F.3d 869, 875-77 & n.2 (6th Cir. 2001)

(finding plaintiff who alleged Fourth Amendment claims for unreasonable seizure, arrest without probable cause, and false imprisonment could not raise separate cause of action for malicious prosecution). In addition to finding malicious prosecution claims precluded unless they accompany a Fourth Amendment claim, the *Frantz* Court read *Albright* to permit a substantive due process claim where no Fourth Amendment claim exists. *Id.* at 877.

Most recently, this Court addressed the viability of a federal malicious prosecution claim in *Darrah v. City of Oak Park*, 255 F.3d 301, 308-11 (6th Cir. 2001). The *Darrah* Court concluded that insofar as *Frantz* was inconsistent with our previous decision in *Spurlock*, we are obliged to follow *Spurlock*. *Id.* at 310 (citing *Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431 n.1 (6th Cir. 2000)). However, the *Darrah* Court went on to analyze the facts of that case under both *Frantz* and *Spurlock* and concluded that, under both approaches, the plaintiff's malicious prosecution claim in that case failed. *Id.*

As in *Darrah*, in the present case, the district court analyzed plaintiffs' claims under the standards set out in *Frantz* and *Spurlock*. However, the *Darrah* Court ultimately concluded that a cause of action must be recognized under *Spurlock*. 255 F.3d at 313. We agree that we are obliged to follow *Spurlock* and recognize a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment. *See id.* at 310.[7]

Although this Court has yet to resolve the elements of a federal malicious prosecution claim, it is clear that a plaintiff

---

[7]Under *Frantz*, we would be required to dismiss Thacker and Gallagher's federal malicious prosecution claims because there is no cause of action separate from their other Fourth Amendment claims. *See Darrah*, 255 F.3d at 310. At most, plaintiffs could recover additional damages as part of a Fourth Amendment claim "if, following an arrest without probable cause in violation of the Fourth Amendment, a prosecution follows." *Id.*

must show, at a minimum, "that there was no probable cause to justify [his] arrest and prosecution." *Id.* at 312. Thacker's arrest and prosecution here were justified by probable cause. Because he cannot show the absence of probable cause, Thacker cannot demonstrate any seizure in violation of the Fourth Amendment. Thus, we need not attempt to enunciate the other elements of a malicious prosecution claim here.

### D.  Qualified Immunity[8]

Whether an officer is entitled to qualified immunity is a question of law that is reviewed *de novo*. *Feathers v. City of Akron*, 319 F.3d 843, 847 (6th Cir. 2003) (citing *Klein*, 275 F.3d at 550). Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. *Ewolski*, 287 F.3d at 500-01 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This Court explained in *Ewolski* that:

> Qualified immunity involves a two-step inquiry. First the court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation occurred. If the court finds a constitutional violation, it must then consider whether the violation involved "'clearly established constitutional rights of which a reasonable person would have known.'"

*Id.* at 501.

---

[8]The district court did not find it necessary to address whether defendants are entitled to qualified immunity. Because this court may affirm the district court's decision on any ground supported by the record, we may review whether defendants are entitled to qualified immunity for their actions. *See Hinchman*, 312 F.3d at 204-05 (citing *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (per curiam)).

Although we have concluded that no constitutional violations occurred in this case, even assuming that such a violation did occur, defendants would be entitled to qualified immunity because they did not violate any clearly established rights of which a reasonable officer would have known. A right will be considered clearly established when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

### 1.  Unlawful Entry

Although no case has explicitly sanctioned an entry into a private home under circumstances identical to those presented here, such precedent is not required for qualified immunity purposes. As this Court has explained in the past: "Although it need not be the case that the very action in question has been previously held unlawful, in light of pre-existing law, the unlawfulness must be apparent." *Hinchman*, 312 F.3d at 205 (citing *Ewolski*, 287 F.3d at 501); *see also Thomas v. Cohen*, 304 F.3d 563, 580 (6th Cir. 2002). Qualified immunity will protect all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It was not apparent that entering plaintiffs' apartment to secure the safety of the paramedics was unlawful. In fact, reasonable officials at the scene would likely disagree over whether the entry into plaintiffs' home violated plaintiffs' rights. "Immunity applies if reasonable officials could disagree as to whether the conduct violated the plaintiff's rights." *Thomas*, 304 F.3d at 580 (citing *McCloud v. Testa*, 97 F.3d 1536, 1553 (6th Cir. 1996)). Thus, we cannot find that it was clearly established that entering a home without a warrant to secure the safety of paramedics under the circumstances presented in this case would violate the Fourth Amendment. Therefore, defendants are entitled to qualified immunity to the extent they committed a constitutional violation when they entered plaintiffs' home.

## 2.  Unlawful Seizure

"It is clearly established that an arrest without probable cause violates the Fourth Amendment." *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997). Insofar as the question of probable cause here is a close one, reasonable officials could disagree as to whether probable cause existed. *See Thomas*, 304 F.3d at 580 (citing *McCloud*, 97 F.3d at 1553). Thus, the defendant officers are entitled to qualified immunity on Thacker's Fourth Amendment seizure claim.

## E.  State Law Claims for Malicious Prosecution and False Arrest

The district court concluded that it was unclear whether plaintiffs intended to pursue supplemental state law claims for malicious prosecution and false arrest, but found, to the extent that such claims were asserted, that they had no merit because there was probable cause for Thacker's arrest and prosecution. On appeal, Thacker asserts that the district court erred in finding his claims for malicious prosecution and false arrest under Ohio law to be without merit. Likewise, Gallagher asserts that the district court improperly concluded that her claim for false arrest fails as a matter of law.

Although the district court addressed the merits of these state law claims, we note that it would have been appropriate to refuse to exercise pendent jurisdiction and to dismiss these claims without prejudice to being re-filed in the courts of the State of Ohio. *See Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir. 1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise jurisdiction over state law claims." (citing *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966))). Although this action may have been particularly appropriate in a case such as this one where the state law claims do not turn on precisely the same standard as do the federal claims, we find the district court's failure to follow this course was harmless under the circumstances of this case.

## 1.  Malicious Prosecution

Under Ohio law, "'[t]he elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in the favor of the accused." *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 732, 736 (Ohio 1990); *see also Rogers v. Barbara*, 164 N.E.2d 162 (Syllabus) (Ohio 1960). Although malice is an essential element in actions for malicious prosecution, "the want of probable cause is 'the real gist of the action.'" *Tourlakis v. Beverage Distribs., Inc.*, 2002 WL 31875970, at *4 (Ohio. Ct. App. Dec. 26, 2002) (citing *Melanowski v. Judy*, 131 N.E. 360, 361 (Ohio 1921)). Thus, if the lack of probable cause is demonstrated, "the legal inference may be drawn that the proceedings were actuated by malice." *Id.* (same).

Ohio law defines probable cause in substantially the same way that it is defined under the Fourth Amendment. In particular, probable cause is assessed based on the facts and circumstances known at the time the offense is charged and requires: "'A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.'" *See Melanowski*, 131 N.E. at 361 (quoting *Ash v. Marlow*, 20 Ohio, 119 (1851)). Insofar as there was probable cause for Thacker's arrest, Thacker's state law claim for malicious prosecution fails.

## 2.  False Arrest

Under Ohio law, a successful false arrest claim requires proof of "(1) a detention of the person, and (2) an unlawful detention." *Faulkner v. Faulkner*, 2000 WL 5910, at *1 (Ohio 2000). The district court disposed of Thacker's false arrest claim based on its finding that defendants had probable cause to arrest him. However, this may not have been appropriate.

The essence of the tort of false arrest is the depriving of a person of his or her liberty without lawful justification.

Specifically, a plaintiff must show only that he or she was detained and that the detention was unlawful. The tort does not require proof of malice, motive or lack of probable cause.

*Tucker v. Kroger Co.*, 726 N.E.2d 1111, 1115 (Ohio Ct. App. 1999); *see also Faulkner*, 2000 WL 5910, at *1 ("False [arrest] per se is not concerned with good or bad faith, malicious motive or want of probable cause on the part of the prosecuting witness, or the officer causing the [detention]. If the [detention] was lawful, it is not the less lawful that any or all of the foregoing elements existed.  These elements relate to an action of malicious prosecution, but are not essential to an action in false [arrest]." (citing *Brinkman v. Drolesbaugh*, 119 N.E. 451 (Syllabus, ¶ 2) (Ohio 1918))).  Nevertheless, here, this distinction makes no difference as plaintiffs have produced no evidence from which a jury could reasonably find that the detention of Thacker was unlawful.  Therefore, this claim fails as a matter of law.

Even viewing the facts in the light most favorable to Gallagher, and presuming that she was handcuffed for a brief period of time, her state law false arrest claim fails for the same reason that her Fourth Amendment claim failed. Gallagher has not provided any evidence of who handcuffed her—that is, it is unclear who is the proper defendant for this claim.

## III.    CONCLUSION

For the reasons described above, we AFFIRM the judgment of the district court.