NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0369n.06

No. 09-1714

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Apr 12, 2013*
DEBORAH S. HUNT, Clerk

KIRK ALFORD, SR., and KIRK PATRICK
ALFORD, II,

    Plaintiffs-Appellants,

v.

DET. JAMES VERNIER, OFFICER
JOSEPH MEIER, WALTER DUNCAN,
ERIK DOLAN, JASON GINOPOLIS.
RYAN BOLTON, AND OFFICER JOHN
DOE, in their individual and official
capacities,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: DAUGHTREY, CLAY, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this civil rights action, filed under

42 U.S.C. § 1983, the district court granted summary judgment to the defendants, who are

various officers of the Oak Park (Michigan) Department of Public Safety, after finding that

they were entitled to qualified immunity from liability for constitutional violations alleged by

the plaintiffs, father and son Kirk Alford, Sr. (Alford Senior), and Kirk Patrick Alford, II

(Alford). The plaintiffs appeal, claiming that the district court erred in dismissing their

claims of illegal search and seizure and use of excessive force under the Fourth

Amendment, and various deprivations of equal protection under the Fourteenth

Amendment, including discrimination and harassment. We agree with the district court's determination that there were no constitutional violations committed by the defendants in this case and affirm the grant of summary judgment, although for slightly different reasons than those given by the district judge.

## FACTUAL AND PROCEDURAL BACKGROUND

The undisputed evidence that the district court gleaned from depositions taken prior to the summary disposition indicated that the encounter between the defendant officers and Alford arose as the result of a call to the Oak Park police from Blake Avery. Avery reported that he had seen a burnt-orange Cadillac pull into the driveway of a residence across the street at 12941 Northfield and its driver, an African-American man, enter the house from the rear. Avery, himself African-American, later explained to police that he mistakenly thought a Caucasian family lived at that residence and called 911 because he feared that a burglary was taking place.

The Oak Park police issued a general dispatch for a possible home invasion in progress at 12941 Northfield. The first officer on the scene, Joseph Meier, found the Cadillac parked in the driveway, as described, and the back door of the house open. He later conceded that there was no sign of a forced entry. Meier nevertheless entered the house and almost immediately encountered Alford coming upstairs from the basement. According to Alford, Officer Meier "pulled [him] out of the house" at gunpoint, patted him down for weapons, and "told [him] to get on the ground" or "put him to the ground" on a nearby patio. Meier told Alford that police had received a report of a break-in and asked

him what he was doing in the house. Alford responded that he lived there, but when Meier checked Alford's identification, the driver's license listed a different residential address. (In fact, the house was Alford Senior's residence. Alford had recently moved out of his father's house but had come by to check for any mail that was still being delivered there.) When Meier pointed out the discrepancy, Alford suggested that Meier telephone Alford Senior to verify that he was legally on the premises, which Meier did. Assured that Alford was not, in fact, a burglar, Meier let him get up from the ground but told him that he could not go back into the house until the other officers who had arrived on the scene were outside. Alford later testified in a deposition that he could not recall how many officers came to the residence or how long they were there. He said that he asked for badge numbers but was given only the number of the police incident report, which he did not request or inspect. In fact, individually-filed police reports reflected that the officers arrived at Alford Senior's residence, "cleared the scene," and left in less than 20 minutes. The reports also indicated "use of force" by the officers only to the extent that they had drawn their weapons when they first arrived at the residence.

In the subsequent complaint filed in this case, the plaintiffs alleged that unspecified defendants "barged into the home" without "knock[ing] or announc[ing] their presence [or] indicat[ing] that they were there pursuant to a search warrant"; "pointed guns at [Alford's] head and yelled to him and ordered him to come outside of the house"; "continued to hold him at gunpoint and began to interrogate him"; and "went inside of the home without permission nor a search warrant and conducted a search [of the premises]." The

gravamen of the complaint was that "at no time did the individual defendants have probable cause enter [*sic*] the premises, order [Alford] out of the house at gunpoint, and to conduct a search of the premises," especially in light of the fact that Alford Senior had a valid permit for a security alarm system that had not been "activated to alert officers that an invasion had occurred."

The complaint alleged that the defendants' actions caused the plaintiffs unspecified "severe injuries and damages," both compensatory and punitive, in the amount of $150,000. However, the claim of excessive force in the complaint was limited to the allegation that the defendants had used "unnecessary and objectively unreasonable physical force . . . [by] forcing [Alford] out of his house at gunpoint." In a later deposition, Alford described being taken out of the house "by the shoulder" and told to get down on the ground. Asked whether the officer had otherwise touched him in any manner, Alford replied, "Just patting me down, to make sure I didn't have any weapons on me." Asked whether the officers had hit or kicked him, "or anything like that," Alford responded that they had not. He also testified that he had not been handcuffed while on the ground.

Despite Alford's deposition testimony that the officers' physical contact with him had been limited to a pat-down after being "grabbed by the collar" and removed from the house, the plaintiffs filed a response to the motion for summary judgment in which they alleged that Alford had been "forcefully thrown to the ground and handcuffed," in obvious contradiction to the sworn deposition testimony that Alford had given six months earlier. Some two weeks after the response to the motion for summary judgment was filed, Alford

executed an affidavit in which he swore that he had been "thrown to the ground" by Officer Meier. In the response, the plaintiffs also alleged that Alford Senior returned to his house and "was shocked beyond belief when he saw that his house had been ranshacked [*sic*]." Although the complaint made no mention of an intensive search of the home by police during the short time that they were on the scene, or state a claim for illegal search and seizure, the plaintiffs alleged – in response to the motion for summary judgment filed almost two years after the fact – that closets, drawers, and tables had been disturbed and that someone had gone through Alford Senior's "personal papers." Moreover, despite the absence of a theft report in the record, the plaintiffs claimed for the first time in their response that "some cash was missing from [Alford Senior's] bedroom, along with a gold mason ring."

The district court granted the defendants' motion for summary judgment, finding that exigent circumstances justified Meier's original entry into the house and that a claim of an illegal search and seizure of Alford Senior's missing property could not be sustained in the absence of any information concerning the identity of the officers who allegedly ransacked the Alford residence. In addition, the district court held that "the police officer defendants did not use constitutionally impermissible force in seizing [Alford]," reasoning that:

> The crime at issue, a possible home invasion, was a serious one that had the potential for danger to the officer and to others. While there is no evidence that [Alford] was in any way uncooperative, and it is possible that the officer's safety could have been ensured with less intrusive conduct, the Court cannot find that the defendants' conduct was an objectively unreasonable use of force under the circumstances.

\* \* \* \* \*

> There was no Fourth Amendment violation because Meier had reasonably believed that [Alford] could be a burglar, and his pushing of [Alford] to the ground and requiring that he remain there while his identity was confirmed was appropriate given the circumstances.

The district court also found that the plaintiffs had the burden "to demonstrate that the officers [we]re not entitled to qualified immunity," but that they "ha[d] not directed the Court to any case that clearly shows that Officer Meier's conduct clearly violated [Alford's] constitutional rights," concluding, therefore, that Meier was entitled to qualified immunity.

The plaintiffs now appeal the district court's grant of summary judgment, arguing (1) that the district court erred by deciding disputed questions of material fact instead of viewing the evidence in the light most favorable to the plaintiffs; (2) that the use of force against Alford was objectively unreasonable, in violation of his Fourth Amendment rights; (3) that the officers could not claim qualified immunity in regard to the use of force against Alford because their conduct violated clearly established rights of which reasonable officers should have known; and (4) that the search and seizure of items from Alford Senior's residence was conducted without probable cause and therefore violated the Fourth Amendment.

## ANALYSIS

We review a district court's grant of summary judgment *de novo*. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In determining whether a genuine dispute of material fact exists, we, like the district court,

must view the evidence in the light most favorable to the non-moving party – here, the plaintiffs. *See 60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The question of whether a defendant is entitled to qualified immunity from liability under 42 U.S.C. § 1983 also is a legal question that we review *de novo*. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).

We reject the plaintiffs' claim that the district court's grant of summary judgment was procedurally deficient. Their brief on appeal fails to specify what disputed issues the district court improperly determined or what evidence the court failed to find in the light most favorable to them. Hence, under Federal Rule of Civil Procedure 56(c)(1)(A), the first issue raised on appeal is unreviewable. Moreover, the only "evidence" that might conceivably be taken to show excessive force was not, in fact, evidence at all. It was, instead, an otherwise unsupported statement in a response to the motion for summary judgment that alleged for the first time that Alford had been "handcuffed" and "brutally forced to the ground with his hands behind his back." But the complaint contained no such allegation, and in his deposition, Alford denied that he had been handcuffed or touched in any way, beyond being patted down for a weapon. In a later affidavit, he did allege that he was "forcefully shoved to the ground." But, it is well-established that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

The district court did find, as fact, that Alford was "pushed" to the ground, but the court also concluded, as a matter of law, that the officer's conduct did not constitute excessive force and, therefore, did not violate the Fourth Amendment. Because there was no constitutional violation, the court did not err in granting summary judgment to the defendants on Alford's claim of excessive force and did not need to reach the question of qualified immunity.

As to Alford Senior's claim that his rights were violated by the warrantless entry into his home and the ensuing search of the residence and seizure of his personal property, we agree with the district judge, first, that there were exigent circumstances to excuse the initial entry without a warrant and, second, that although the scope of the search was arguably excessive, the plaintiffs' failure to tie the illegality to any particular defendant prevented recovery. Although there appears to be no dispute that numerous law enforcement officers entered the Alford residence, discovery conducted by the plaintiffs failed to yield any information supporting their bald assertion that personal property had been seized. In the absence of any evidence contradicting the defendants' sworn affidavits and deposition testimony that no property of the Alfords was removed from the home, and absent any identification of an individual even arguably responsible for such an action, we necessarily agree with the ruling of the district court that the plaintiffs have failed to adduce the evidence necessary to defeat the defendants' summary judgment motion.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.

**HELENE N. WHITE, Circuit Judge**, concurring in part and dissenting in part.

I respectfully dissent regarding the claim that Defendants violated the Fourth Amendment by their warrantless entry and search of the Alford home.

Meier entered 12941 Northfield without a warrant and encountered Alford II inside the back door. Subsequently, other officers entered the house and conducted a search of the premises, also without a warrant. The district court held that this search, though warrantless, was justified by the exigency exception to the Fourth Amendment's warrant requirement.

In most circumstances, the Fourth Amendment prohibits warrantless entry of police into a person's home. *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "Warrantless entries are permitted, however, where 'exigent circumstances' exist." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). "Exigent circumstances exist where there are 'real immediate and serious consequences that would certainly occur were a police officer to 'postpone[ ] action to get a warrant.'" *Id.* (quoting *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (alteration in original) (some internal quotation marks omitted)). "The relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Id.* Under the exigency exception, "police may 'enter a residence without a warrant if there is probable cause to believe that there is a burglary in progress.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting *United States v. Reed*, 141 F.3d 644, 649 (6th

Cir. 1998)). Although both probable cause *and* exigency are needed under this rule, "when the police have probable cause to believe that a burglary is in progress, they are also confronted with the necessary exigency, that is, the need 'to ensure the protection of everyone on the scene and to prevent the loss or destruction of the owner's property.'" *Id.* (quoting *United States v. Johnson*, 9 F.3d 506, 510 (6th Cir. 1993)). "The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Johnson*, 9 F.3d at 509.

The district court held that the initial entry into the Alford home was justified by exigent circumstances because

> defendants were responding to a 911 report of a possible home invasion. The person calling the tip stated that he was a neighbor of Alford Sr. and gave his name and address, and the basis for his belief that the Alford home was being invaded, which gave the officers probable cause to enter the home. The fact that the neighbor was incorrect, that the Alford home was not being invaded, that Alford II was legitimately there, and that the neighbor thought that the residents of the house were white, does not make the officer's conduct in entering the home unreasonable.

*Alford*, 2009 WL 1299568, at \*10. I disagree, and would find that the officers did not have probable cause to enter Alford Sr.'s home.

In *United States v. McClain*, 444 F.3d 556 (6th Cir. 2005), this court held that

> a neighbor's phone call indicating that the owners had moved out of the house . . . several weeks earlier and that there was a light on in the house that had not been on before, even coupled with the officers' discovery of a slightly ajar front door, does not present the type of objective facts necessary to establish probable cause that a burglary was in progress at the house. Under similar circumstances, our precedent has required more-namely, the existence outside the searched premises of some physical signs of a burglary or some direct evidence of a home invasion.

*Id.* at 563. In *Johnson*, by contrast, a neighbor called to report a burglary in progress and "reported seeing individuals crawl through the window. 9 F.3d at 507. When the officers arrived at the residence, they discovered that the doors were locked and that a kitchen window had a broken pane." *Id.* The officers saw individuals inside the home through the broken window and, after speaking to them, determined that their explanations of why they were in the house were not credible. *Id.* at 507, 509-10. These facts, in combination, created probable cause to believe a burglary was in progress, and thus exigency to enter the house. *Id.* at 509-10.

Here, as in *Johnson*, police received a credible phone tip from a neighbor about a burglary in progress: the neighbor stated that he saw someone enter the back gate of the house who he did not think was a resident and provided a physical description of that person. However, as in *McClain*, police encountered no signs of forced entry when they arrived at the house, nor did they see anyone inside the house until Officer Meier entered through the back door. The phone call did provide some "direct evidence of a home invasion," *McClain*, 444 F.3d at 563, but not as much as in *Johnson*.[1]

Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," and "police must have an objectively reasonable basis for their belief that a crime is being committed." *McClain*, 444 F.3d at

---

[1]The 911 caller, Avery, apparently based his suspicion that a burglary was in progress on his mistaken belief that the residents of 12941 Northfield were White. There is no evidence, however, that the responding officers knew of Avery's basis for making the call until *after* they arrived at and searched the house. Further, the race of the person hardly seems relevant.

562–63 (citations and internal quotation marks omitted). That standard is not satisfied here. The phone call tip, which included information about the identity of the caller and the basis of his belief that a burglary was in progress, did contain some indicia of reliability in support of probable cause. *Cf. Florida v. J.L.*, 529 U.S. 226, 270, 273–74 (2000) (requiring that anonymous tips must provide indicia of reliability in order to provide reasonable suspicion for a *Terry* stop and frisk). *But see Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003) (declining to find that "a 911 call alone may justify a warrantless entry into a private home" under the exigency exception for protecting the police or others from a risk of danger). On the other hand, the lack of evidence of forced entry, such as a broken window or a splintered door jamb, weighs against finding probable cause, although it is not determinative. *See United States v. Brown*, 449 F.3d 741, 748–49 (6th Cir. 2006) ("[I]t is the totality of the circumstances and not the presence of pry marks or a broken window that is determinative" in "establish[ing] probable cause to believe a burglary [is] in progress.") In *Brown*, an officer (Edmonds)

> responded to a burglar alarm that he knew had been triggered twice in a relatively short period of time and arrived within just a few minutes of the first activation. He was not met by a resident of the house, but by the neighbor who directed him to the basement door. The sounding alarm, the lack of response from the house, and the absence of a car in the driveway, made it less likely that this was an accidental activation. Investigating, Edmonds found the front door secured but the basement door in the back standing ajar. While Edmonds did not find a broken window or pry marks on the open door, it was objectively reasonable for him to believe that this was not a false alarm but, rather, that the system had recently been triggered by unauthorized entry through the open basement door. These circumstances, including the recently activated basement door alarm and evidence of a possible home invasion through that same door, establish probable cause

> to believe a burglary was in progress and justified the warrantless entry into
> the basement.

*Id.* at 748-49. In the instant case, Meier responded to a credible 911 call and, on arriving at the house, observed that the back door was open (like in *Brown*), but the screen door was closed. However, the 911 call, alone, was insufficient to create probable cause. Police had not received information that the security alarm at the house had been triggered and could see no signs of forced entry. Further, while the 911 caller stated a basis for his belief that a burglary was in progress–that he had seen a man walk toward the back entrance of the house, which was hidden from his view by a fence–that basis was not as compelling or substantive as the basis in *Johnson*, where the caller reported seeing individuals crawl through the window. 9 F.3d at 507. Although the 911 call here likely did create *reasonable suspicion* that a crime was in progress, nothing that officers encountered outside 12941 Northfield provided information allowing that suspicion to ripen into probable cause. Thus, in the absence of any signs of a burglary, the warrantless entry into the house was not reasonable.

I would further hold that Meier and the other officers who entered the house are not entitled to qualified immunity. The standard for warrantless entry on suspicion of a burglary in progress is clearly established, *see McClain*, 444 F.3d at 562; *Johnson*, 9 F.3d at 510, and it should have been "clear to a reasonable officer that his conduct [warrantless entry onto the premises] was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202. It is clearly established law that exigent circumstances in a case such as this require probable cause to believe a burglary is in progress. Officers are frequently called upon to

determine whether probable cause exists that a crime is being committed, and are no

strangers to that inquiry. Qualified immunity is therefore inappropriate on this issue.