**Rodney SMOCK, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee.**

**No. 89A01–0105–CR–191.**

Court of Appeals of Indiana.

March 20, 2002.

E. Thomas Kemp, Richmond, Indiana, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

---

1. Ind.Code § 35–42–1–1(1) (Burns Code Ed. Supp.2001).

## OPINION

SULLIVAN, Judge.

Following a jury trial, Rodney Smock was convicted of Murder,[1] a felony, and being a habitual offender.[2] Upon appeal, he presents two issues for our review:

(1) whether the trial court erred in admitting evidence seized without a warrant, and

(2) whether the verdict form utilized during the habitual offender phase of the trial violated Article 1, Section 19 of the Indiana Constitution.

We affirm.

The facts most favorable to the judgment reveal that in the late evening hours of March 22, 2000, officers from the Richmond Police Department were dispatched to Smock's apartment following a neighbor's report of a strong odor. Upon arriving at the apartment building, the complainant indicated that there was a strong odor in the air, which the officers could smell, and that he had not seen one of his neighbors in some time. The officers went to Smock's apartment and received no answer upon knocking on the front and back doors. Based upon the odor of decay and their concern about the well-being of someone inside Smock's apartment, the officers contacted their supervisors, including Captain Chris Wolski. After learning that people had been coming in and out of the apartment, Wolski used his pocket-knife to unlock the door because he determined that it was necessary to gain entry into the apartment to see if someone inside needed help. Once inside, the four officers conducted a search of the apartment using their flashlights to see if anyone was inside. The final place searched by Wolski

2. Ind.Code § 35–50–2–8 (Burns Code Ed. Supp.2001).

was a closet underneath the stairs, wherein the body of Tim Miller was found in a pile of clothes and bags which had been covered with paint, bleach, and other cleaners.

After finding the body, the officers secured the scene and waited for detectives and the coroner to arrive. Upon the arrival of detectives and the coroner, the officers re-entered Smock's apartment and from the kitchen gathered items of evidence, which were covered in dried blood. The items included a claw hammer, a lockblade knife, and a box cutter. The items were collected and packaged at approximately 4:15 a.m. on March 23, and later removed from the apartment. Around 8 a.m., a search warrant was obtained, after which officers conducted a further search of Smock's apartment, locating a knife in a drawer. The knife had also apparently been used in the attack upon Miller.

Upon learning that the police had found the body in his apartment, Smock, who had been living at Miller's apartment since Miller's death, fled to Union City and spent the weekend there in a motel. On March 27, Union City Police were called to the motel because of a disturbance caused by Smock. Smock had attempted to commit suicide by slitting his wrists and left arm. When the officers asked why Smock wanted to kill himself, he replied that he had killed someone in Richmond and that he was wanted by the police. In the motel room, the police also recovered a prescription bottle that belonged to Miller. Smock was then transported to a hospital for treatment.

Later that day, Detective Harold Raver of the Richmond Police Department was notified that Smock was being treated at Winchester Hospital. Raver went to the hospital and placed Smock under arrest for the murder of Miller. Smock was given his Miranda warnings at that time, and

also again on March 29, before Raver conducted an interview and took a statement from Smock. Smock confessed in detail to the murder.

■■■■ The Fourth Amendment to the Constitution of the United States requires a warrant be issued before a search of a home is conducted in order to protect against unreasonable searches and seizures. *Swanson v. State*, 730 N.E.2d 205, 208 (Ind.Ct.App.2000), *trans. denied.* However, there are exceptions to the warrant requirement. *State v. Straub*, 749 N.E.2d 593, 597 (Ind.Ct.App.2001). The State bears the burden of proving that an exception to the warrant requirement exists when a warrantless search is conducted. *Swanson*, 730 N.E.2d at 208. A well-recognized exception to the warrant requirement is when exigent circumstances exist. *Vitek v. State*, 750 N.E.2d 346, 348–49 (Ind.2001), *reh'g denied.* Under the exigent circumstances exception, police may enter a residence if the situation suggests a reasonable belief that someone inside the residence is in need of aid. *Id.* at 349. The facts and circumstances of each warrantless search and seizure determine its validity. *Robinson v. State*, 730 N.E.2d 185, 192 (Ind.Ct.App.2000), *trans. denied.*

■■■ Smock asserts that the officers violated his Fourth Amendment right to be free from unreasonable searches and seizures because they entered his apartment and seized items without a warrant. The State counters that the officers could enter Smock's apartment under the exigent circumstances doctrine because of the odor present in the apartment building, the report that Smock had not been seen in some time, and the acknowledgement by neighbors that many people had come and gone from the apartment. The State reasons that these circumstances created the reasonable belief that someone may be in the apartment in need of aid. Smock con-

tends that the odor of decay precluded the officers from possessing any belief that someone was in need of aid in the apartment. Rather, Smock contends that the facts show that a fatality had already occurred; therefore, no exigent circumstances existed, and the police should have obtained a warrant before entering the apartment.

No Indiana case has directly addressed the issue of whether the presence of a strong odor of decay may form the basis for the exigent circumstance exception to the warrant requirement. However, in *Vitek*, our Supreme Court did rely upon *United States v. Presler*, 610 F.2d 1206 (4th Cir.1979), in upholding a warrantless entry of a home in search of a missing person. In *Presler*, the Fourth Circuit Court of Appeals upheld a warrantless entry of a home when the defendant's landlady had not seen him in some time and an unusual odor was emanating from his room. Likewise, in *State v. Scott*, 343 N.C. 313, 471 S.E.2d 605 (1996), the North Carolina Supreme Court upheld a warrantless search of a crawl space under a house and the subsequent entry of the residence when a police officer noticed green flies and the smell of rotting flesh coming from the crawl space. Several other cases have similarly found that there was no violation of the warrant requirement when officers smelled the odor of decaying flesh and had further fears that someone may have been in the residence in need of aid. *See State v. Epperson*, 571 S.W.2d 260 (Mo.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *People v. McGee*, 140 Ill.App.3d 677, 95 Ill.Dec. 218, 489 N.E.2d 439 (1986) (upholding warrantless entry of a residence without evidence that the officer believed that someone inside the house may have been in need of aid because of the uncertainty of what officers would find upon entering the residence based upon the odor and the general condition of the house as seen through the windows), *appeal denied.*

While we do not address whether the presence of the odor of decaying flesh in and of itself is enough to trigger the exigent circumstances exception to the warrant requirement, we hold that in this situation the officers did have a reasonable belief that someone may have been in need of immediate assistance. Just as in the above cited cases, the officers could smell the odor of decaying flesh. They were unable to make contact with anyone in the apartment through knocking. They had information that Smock had not been seen in some time. They were also told that many people had come and gone from the apartment, leading them to believe that someone could still be inside of the apartment alive but severely injured, or that someone may have been hiding in the apartment. Based upon the reasonableness of the officers' beliefs, no warrant was needed for the initial entry and search of Smock's apartment, which resulted in the discovery of Miller's body.

■ However, while no warrant was needed to enter Smock's apartment initially, the facts are clear that upon finding the body the officers did not remain inside the apartment, but exited the apartment to wait for the arrival of detectives and coroner. After detectives and the coroner arrived, the officers re-entered the apartment and seized items of evidence, including the claw hammer, a knife, and a box cutter, so that they would not be disturbed and contaminated by the individuals retrieving the body and to prevent someone from being accidentally injured by one of the knives. This seizure, upon re-entry of the apartment, did violate the Fourth Amendment's protection against unreasonable searches and seizures. *See Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct.

2408, 57 L.Ed.2d 290 (1978) (holding that there is no murder scene exception to police officers obtaining a warrant, as required by the Fourth Amendment, before searching a residence which is the scene of a homicide); *see also Middleton v. State*, 714 N.E.2d 1099 (Ind.1999) (holding that even though officer could initially seize items of evidence found in plain view in a home, once he left the home, he could not re-enter the home without obtaining a warrant, receiving consent of the owner, or meeting another exception to the warrant requirement).

Here, as in *Middleton, supra*, the officers were originally upon the premises legitimately in response to exigent circumstances. Further, in *Middleton*, the officers left the premises but returned, re-entered and seized the items in controversy.

It is worthy of note that in *Mincey, supra*, the police officers' original entry and the subsequent investigation and search were continuing and unbroken in time.[3] Nevertheless, the U.S. Supreme Court held the search was not justified by any exception to the warrant requirement.

We might attempt to differentiate our case from *Mincey* in that here there was but a very brief plain view seizure of three items as opposed to the two or three hundred items seized during the four day extensive and extremely intrusive search in *Mincey*.[4] However, *Mincey* held that once the fatally wounded officer and the wounded defendant had been removed from the scene and the premises secured, there were no further exigent circumstances. *Mincey*, 437 U.S. at 394, 98 S.Ct. 2408. Furthermore, the Court explicitly held that there is no "murder scene" exception to the warrant requirement of the Fourth Amendment. *Id.* at 395, 98 S.Ct. 2408. Subsequent to *Mincey*, the U.S. Supreme Court has twice in *Per Curiam* opinions reiterated that clear holding. *See Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) (unconscious murder suspect transported to hospital by initial investigating officer; subsequent entry by other officers thirty-five minutes later resulting in two hour search held invalid); *Flippo v. West Virginia*, 528 U.S. 11, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (injured murder suspect transported to hospital; search taking place several hours later by investigators who re-entered the murder scene premises was held unconstitutional).

In light of cases from other jurisdictions, the actions of the officers in this case may seem wholly reasonable in seizing the items which very well might have been used in the murder. In *La Fournier v. State*, 91 Wis.2d 61, 280 N.W.2d 746 (1979), the initial investigating officer left the premises in order to take a drug overdose victim to the hospital. Officers arriving within minutes seized drug paraphernalia in plain view on the floor. The Wisconsin Supreme Court, citing *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), held that the subsequent intrusion of the evidence technicians and another investigator was merely a continuation of

---

**3.** The narcotics officers making the original entry were required by police policy to discontinue or forego further investigation until police detectives arrived ten minutes later. The policy precluded officers involved in a criminal incident, such as the undercover drug raid in *Mincey*, from conducting a subsequent investigation.

**4.** The Court's holding in *Mincey* was unanimous, although then Justice Rehnquist observed that although the four day search was unconstitutional, evidence in danger of being damaged or destroyed, such as blood on the floor, might have been validly seized and preserved on the day of the initial entry. *Mincey*, 437 U.S. at 406, 98 S.Ct. 2408.

the initially valid entry by the first officer.[5] *La Fournier*, 280 N.W.2d at 751. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997) is analogous. There, the Arkansas Supreme Court acknowledged that *Mincey, supra,* precludes reliance upon a "murder scene" exception and also noted that in the search and seizure in the case before them, exigent circumstances no longer existed, there was no consent to the subsequent entry and there was no danger of loss or destruction of evidence. *Id.* at 653. Nevertheless, in reliance upon *La Fournier v. State, supra,* the Court upheld the subsequent entry, and seizure of thirty items in plain view as but a continuance of the initial entry. *Id.; see also Smith v. State,* 419 So.2d 563 (Miss.1982), *overruled upon other grounds.*

■ Be that as it may, *Middleton v. State, supra,* is controlling upon this court as is the clear and unmistakable import of *Mincey v. Arizona, supra.* Here, the officers had ample opportunity to obtain a search warrant before re-entering the apartment with the coroner to retrieve the body, as approximately four hours had passed since the officers initially located the body. Nevertheless, the violation of the Fourth Amendment protection against unreasonable searches and seizures is not critical to the State's case as the admission of the claw hammer, the lock-blade knife, and the box cutter was harmless error.

■ Admissions of evidence in violation of the Fourth Amendment are subject to harmless error analysis. *Jackson v. State,* 669 N.E.2d 744, 750 (Ind.Ct.App. 1996). Harmless error occurs when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no likelihood that the erroneously admitted evidence contributed to the conviction. *Morales v. State,* 749 N.E.2d 1260, 1267 (Ind. Ct.App.2001). Violations of the Fourth Amendment must be harmless beyond a reasonable doubt. *Id.* We must find that there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant in relation to everything else before the jury on the issue in question. *Id.*

Even with the exclusion of the erroneously admitted murder weapons, the jury still properly received evidence of the discovery of the body in Smock's apartment. The State also properly submitted a knife that was lawfully seized following the receipt of the search warrant. Finally, the jury heard evidence of Smock's statement to the Union City Police Officers, in which he stated that he killed someone in Richmond, and Smock's confession, after receiving the *Miranda* warnings, to the method of his beating and stabbing Miller. This is ample evidence of Smock's guilt in order to support the conviction and leaves no doubt that the erroneous admission of the weapons was harmless error.

■ Smock also contends that the trial court committed fundamental error in the submission of the verdict form to the jury in the habitual offender phase of the trial.[6] Smock specifically challenges the language in the form in which the jury was to find him a habitual offender or not a habitual offender. He argues that the jury was not given the option of finding that even though the State had proven that he had been convicted of the requisite number of

---

5.  In *Tyler,* a fire was extinguished and arson investigators left and returned five hours later with police. The U.S. Supreme Court held that it was a continuation of the first entry. *Tyler,* 436 U.S. at 511, 98 S.Ct. 1942.

6.  Smock acknowledges that no objection was made to the verdict form at trial and that his only recourse is for this court to determine that fundamental error occurred.

felonies, that he still was not a habitual offender. The challenged language states, "Accordingly, we, the jury, find the Defendant, Rodney Smock:

[ ] IS (if the defendant has accumulated two (2) or more prior unrelated felony convictions and committed and was convicted of a felony in Phase 1)

OR

[ ] is NOT (if the defendant has NOT accumulated two (2) or more prior unrelated felony convictions or did not commit and be convicted of a felony in Phase 1) an habitual offender." Appellant's App. at 203.

In *Seay v. State*, 698 N.E.2d 732 (Ind. 1998), our Supreme Court held that according to Article 1, Section 19 of the Indiana Constitution, the jury is the judge of the law and the facts in a habitual offender proceeding. In so doing, our Supreme Court adopted the principle enunciated by Justice Dickson in several previous cases, including his dissent in *Hensley v. State*, 497 N.E.2d 1053 (Ind.1986). The verdict form in *Hensley* stated that the "jury find[s] beyond a reasonable doubt that the defendant Raymond Hensley is an habitual offender in that he has the following prior convictions." *Id.* at 1057. The form then required the jury to mark yes or no next to a list of prior convictions. In *Hensley*, Justice Dickson wrote that the verdict form did not give the jury the right to find that the defendant was not a habitual offender even though the State had proved the requisite prior felonies.

Similarly, in *Womack v. State*, 738 N.E.2d 320 (Ind.Ct.App.2000), *trans. denied*, this court held that it was erroneous for a verdict form to state only two possible guilty verdicts, depending upon whether the State proved that Womack had a prior conviction, during a trial for possession of marijuana. The proof of the prior conviction was to be used to enhance a conviction from a Class A misdemeanor to a Class D felony. In our decision, we determined that the two verdict options of guilty took away the power conferred upon the jury by Article 1, Section 19 of the Indiana Constitution, in not allowing the jury to decide that even though the State had proved a prior conviction, the jury could still find Womack guilty of the lesser offense. *Id.* at 328.

Here, the verdict form given to the jury was clearly erroneous. The jury was not given the option to find that Smock was not a habitual offender even if the State proved the requisite prior felonies. However, we may reverse the habitual offender finding only if the submission of the erroneous verdict form constituted fundamental error. Fundamental error is error that is blatant, with potential for harm that is substantial and appears clearly and prospectively. *McCollum v. State*, 582 N.E.2d 804, 816 (Ind.1991). While the verdict form was erroneous, it did not result in fundamental error. The jury still had to determine whether or not the requisite felonies were proved, and the jury was instructed that it was the judge of the law and the facts, the appropriate instruction given for informing the jury of its power under Article 1, Section 19. Thus, there was no potential for substantial harm. *See id.* (no fundamental error when habitual offender verdict form required jury to decide if defendant was guilty of two prior felonies but not if defendant was a habitual offender).

The judgment of the trial court is affirmed.

KIRSCH, J., and ROBB, J., concur.