**Troy CUDWORTH, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A02–0312–CR–1037.

Court of Appeals of Indiana.

Nov. 24, 2004.

Steven Knecht, Vonderheide & Knecht, Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Troy Cudworth appeals his convictions for Conspiracy to Commit Dealing in Methamphetamine, a Class B felony, and Possession of Chemical Reagents or Precursors with Intent to Manufacture Controlled Substances, as a Class D felony,[1] following a jury trial. Cudworth raises three issues on appeal, one of which we

find dispositive, namely, whether the trial court abused its discretion when it denied Cudworth's motion to suppress evidence.

We reverse.

### FACTS AND PROCEDURAL HISTORY

On September 22, 2002, Amy Clements and Cudworth lived together at 3205 Jordy Drive in Lafayette. At approximately 10:00 p.m. that night, the Lafayette Police Department dispatch received an anonymous tip that a person with the first name "Louis" was being held at gunpoint at 3205 Jordy Drive. Lafayette Police Officers Bruce Briggs and Tammy Severin, among others, responded to the call.

Approximately four months prior, Officer Briggs had arrested Abram Jackson at the same residence. At that time, Jackson had an outstanding warrant. In addition, Officer Severin had knowledge that "there was a Louis at that residence about a month prior[.]" Appellee's App. at 35. In particular, Officer Severin was at Cudworth's home investigating a complaint that a juvenile had jumped on the hood of a person's vehicle and was kicking the windshield. During her investigation, Cudworth told the officer that the juvenile's name was "Louis." *Id.* at 36. And when the officers ran a check on the residence in their computer system, the system alerted that persons in the house "have been violent to law enforcement in the past." *Id.* at 37.

En route to 3205 Jordy Drive, Officer Briggs had the police dispatcher place a telephone call to the residence and order everyone inside to exit the house. When the officers arrived, Clements told one the officers that she had "a couple of friends" inside the house. *Id.* at 46. Thereafter, six or seven persons, including Cudworth,

---

**1.** The State's charging information refers to that crime as "Illegal Drug Lab."

exited the home.[2] Officer Severin then advised them why the officers were there, and "everyone stated [to the officers] that they had no idea what was going on." *Id.* at 47.

Theresa Coleman had been at Clements and Cudworth's home for approximately fifteen minutes before the police arrived. Coleman was helping her daughter, who is friends with Clements and Cudworth, move into the house that day, and she had seen a man named Lewis Plybon[3] "walking down the sidewalk towards his truck when [she] pulled into the driveway." Appellant's App. at 112. Coleman did not see Plybon inside the house.

After the officers ordered everyone to exit, Coleman walked "about four steps into the yard" when the officers ordered her and the others to stop, turn around, and walk backwards toward the officers. *Id.* at 113. The officers asked Coleman, her son and daughter, and her daughter's boyfriend whether there was a man inside the house being held at gunpoint, and Coleman told them "no." *Id.* The officers also asked if there was anyone still inside the house, and she again said "no." *Id.* They then asked whether she saw anyone with a gun inside the house, and she replied "no." *Id.* After the officers determined that none of the persons who had exited the house were named "Louis," they entered the residence and began searching the home.

Officer Severin was the first officer to enter the house. From the time the officers ordered everyone to exit the home until the search was completed, forty-five minutes elapsed. During the search, officers discovered a revolver and a sawed-off shotgun in plain view in the attic. The officers also found a trash bag in the garage that contained evidence of items used to manufacture methamphetamine. At that point, the officers decided to obtain a search warrant. During the subsequent search, officers found digital scales, aluminum foil, a one-gallon jug of hydrochloric acid, a hydrochloric acid generator, a coffee filter with a purple stain, striker plates from match books, a coffee grinder, isopropyl alcohol, and a hose. In a bedroom, the officers also found a pipe that contained marijuana.

On September 23, 2002, the State charged Cudworth with six counts, including conspiracy to commit dealing in methamphetamine and possession of chemical reagents or precursors with the intent to manufacture methamphetamine. In January 2003, Cudworth filed a Motion to Suppress Evidence obtained during the search of his residence. The trial court held a hearing on that motion over a period of several days. On June 10, 2003, the court denied his motion to suppress. Cudworth renewed his motion to suppress at trial, and the trial court overruled his objection to the evidence recovered during to the search of the home.

Of the six charges filed, the jury found Cudworth guilty only of conspiracy to commit dealing in methamphetamine and possession of chemical reagents or precursors with the intent to manufacture methamphetamine. The trial court entered judgment of conviction on the conspiracy charge only and sentenced Cudworth to eighteen years, with twelve years executed and six years suspended to probation. This appeal ensued.

---

2. At the hearing on Cudworth's motion to suppress, Officer Briggs testified that seven people exited the house, but Officer Severin testified that only six people exited.

3. There was no testimony that clarified whether Lewis Plybon is the same "Louis" named by the anonymous tipster.

## DISCUSSION AND DECISION

Cudworth asserts that the trial court abused its discretion when it denied his motion to suppress and admitted the evidence the police recovered from his home at trial because the officers' warrantless search violated the Fourth Amendment to the United States Constitution.[4] The State responds that the search was justified under the exigent circumstances exception to the warrant requirement.

■■■ A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its rulings only where it is shown that the court abused that discretion. *Griffith v. State*, 788 N.E.2d 835, 839 (Ind.2003). And we review the denial of a motion to suppress that is renewed at trial in a manner similar to other sufficiency matters. *See id.* (holding trial court properly denied motion to suppress confession where defendant alleged confession was product of warrantless arrest without probable cause). We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind.Ct.App.2000), *trans. denied*. However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant. *Id.*

■■■ The Fourth Amendment provides each person the right to be secure in his or her person, houses, papers and effects against unreasonable searches and seizures. *Bryant v. State*, 660 N.E.2d 290, 300 (Ind.1995), *cert. denied*, 519 U.S. 926, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996). Generally, a search or seizure may only be conducted pursuant to a lawful warrant. *Id.* The cardinal principle in search and seizure jurisprudence therefore is that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . .—subject only to a few specifically established and well-delineated exceptions.' " *Id.* (citations omitted). The State bears the burden of proving that an exception to the warrant requirement exists when a warrantless search is conducted. *Smock v. State*, 766 N.E.2d 401, 404 (Ind.Ct.App. 2002). The remedy for an illegal warrantless search is the suppression of the evidence obtained from the search. *See Sloane v. State*, 686 N.E.2d 1287, 1290 (Ind.Ct.App.1997).

■■■ One exception to the warrant requirement is when exigent circumstances exist. *See Smock*, 766 N.E.2d at 404. Under the exigent circumstances exception, police may enter a residence without a warrant "when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "However, a police officer's subjective belief that exigent circumstances exist is insufficient to make a warrantless search." *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir.2000). Rather, "as is normally the case for Fourth Amendment inquiries, the test is objective: 'the government must establish that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.' " *Id.* (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir.1993)). "[E]xigent circumstances justify dispensing with the

---

4. Cudworth also contends that the warrantless search was unreasonable under Article I, Section 11 of the Indiana Constitution. Because we reverse on Fourth Amendment grounds, we need not address his state constitutional claim.

search warrant but do not eliminate the need for probable cause." *Harless v. State*, 577 N.E.2d 245, 248 (Ind.Ct.App. 1991).

 As an initial matter, during the hearing on Cudworth's motion to suppress, the officers referred to the search of Cudworth's home as a "protective sweep." *See* Appellee's App. at 11. In its written order denying Cudworth's motion, the trial court concluded, and we agree, that the search at issue was not a protective sweep. In *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court held that *incident to an arrest*, police officers may, as a precautionary matter and without probable cause or reasonable suspicion, conduct a brief search of areas immediately adjoining the place of arrest from which an attack could be immediately launched. The Court emphasized that "such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335, 110 S.Ct. 1093. The officers in this case did not enter Cudworth's residence incident to his or anyone else's arrest. Thus, the trial court correctly determined that the search of the home was not a protective sweep.

Still, the trial court concluded that the State met its burden of proving that exigent circumstances existed, thereby justifying the warrantless search of Cudworth's home. In support, the court relied primarily on an opinion from the United States Court of Appeals for the Sixth Circuit, *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir.2003). *Thacker* involved a civil rights suit against various city police

officers. Specifically, the plaintiffs, Gallagher and her live-in fiancé Thacker, brought a civil rights action against the officers after the officers entered their home in response to a 911 call reporting injuries to Thacker. The officers eventually arrested Thacker for a domestic violence offense. *Id.* at 248. The plaintiffs alleged, among other things, that the officers violated their Fourth Amendment rights and state tort law by unlawfully entering their home. *Id.*

In that case, Gallagher and Thacker had been out drinking with friends, and they continued to consume alcohol after they returned home. At some point, Thacker dropped a beer bottle on the kitchen floor, slipped, and fell on the broken bottle, cutting his wrist. After Gallagher realized that Thacker was bleeding, she called 911. *Id.* at 249. Gallagher, who was intoxicated, told the 911 dispatcher that someone named "Jeff" had cut one of his wrists. Thereafter, paramedics were dispatched to the home to attend to what the dispatcher had labeled an apparent suicide. *See id.* And police officers were dispatched to the same location on a Code 10–14, which refers to either a cutting or stabbing. *Id.*

The paramedics arrived first, but waited for the officers to arrive and secure the scene. The officers then knocked on the apartment door, and both Gallagher and Thacker answered.[5] The officers observed in plain view broken glass on the floor and an indentation in one wall with a liquid stain beneath it. In addition, Thacker's hand was bleeding profusely. Thacker, visibly intoxicated and immediately belligerent, used profanity and told the officers that he had called for paramedics, not police. He then invited the paramedics

---

5. Based on facts contained later in the opinion, it appears that Gallagher was standing behind Thacker when they answered the door because the officers did not see her until after they had crossed the threshold to enter the apartment. *See id.* at 254.

into the apartment, but not the officers. At that point, the officers determined that Thacker was not a reliable source of information and entered the apartment to investigate. *Id.* Thereafter, the officers observed bruises on Gallagher and, after further investigation, arrested Thacker for a domestic violence offense. *See id.* at 250–51.

Gallagher and Thacker argued, in part, that the officers' entry and search violated the Fourth Amendment. The court disagreed and concluded that exigent circumstances existed. Specifically, the court stated in relevant part:

> *When the officers arrived at plaintiffs' residence, their observations and the need to safeguard the paramedics supported the conclusion that there existed exigent circumstances, justifying entry into plaintiffs' home without a warrant.* In particular, the totality of the circumstances, including the 911 emergency call, Thacker's conduct, and the uncertainty of the situation, justified entry to secure the safety of the police, paramedics, and other people possibly inside the home.
>
> Viewing the facts in the record most favorable to the plaintiffs,[6] the following information was available to the officers before they entered plaintiffs' apartment. Someone had placed a 911 call reporting an emergency—a cutting or stabbing—at the residence. Thacker answered the door shirtless, with blood on his legs and boxer shorts. It was apparent that Thacker himself was injured, as the officers could see that he was bleeding from a cut on his hand. The cut was deep enough to require stitches, but Thacker had wrapped his shirt around his hand to slow the pro-

fuse bleeding. Immediately, Thacker acted belligerently and used profanity. He appeared intoxicated. Thacker failed to provide any explanation for the injury. Instead, he demanded assistance from the paramedics, who were waiting outside for the officers to tell them that it was safe to enter. "When the door was opened," [one of the officers] could see the kitchen area, including the kitchen table, to the right and the main living room area to the left. In the kitchen, [the officer] could see a broken beer bottle on the floor, a hole in the kitchen wall a "couple feet off the floor," and liquid splashed on the wall and spilled on the floor. The officers did not see Gallagher until they were already crossing the threshold to enter the apartment, at which point Thacker left the doorway to sit at the kitchen table.

> Although it presents a close question, the uncertainty of the situation, in particular, of the nature of the emergency, and the dual needs of safeguarding the paramedics while tending to Thacker's injury, created exigent circumstances here.

*Id.* at 254 (emphasis added). The court went on to conclude that:

> [T]he potential dangers attendant to a cutting or stabbing call, the fact that plaintiffs' [sic] solicited the response they received, the need to safeguard the paramedics and others, including creating a safe environment and figuring out what happened, and the need to act swiftly to tend to Thacker's injury justified the entry in this case.

*Id.* at 255.

The only similarity between this case and *Thacker* is that in both cases, the

---

**6.** The plaintiffs were appealing from the district court's entry of summary judgment in

favor of the officers.

police responded to 911 calls reporting serious crimes and/or injuries. Beyond that, this case is readily distinguishable from *Thacker*. First, the officers in *Thacker* were able to immediately corroborate facts received from the 911 emergency call, namely, they observed Thacker standing in the doorway bleeding. In addition, Thacker was intoxicated and belligerent and refused to explain how he had been injured. The officers observed in plain view broken glass, a hole in the wall, and liquid spilled on the floor and wall. And at that point, the officers did not know if anyone else was inside the apartment. In other words, the officers in *Thacker* were called to respond to a potential cutting or stabbing, and all they knew after their conversation with Thacker was that his hand was bleeding, he had blood on his clothes, he would not tell them why or how he was injured, and the apartment showed evidence of a struggle.

In this case, however, once the police officers arrived at Cudworth's home, they observed nothing like what the officers in *Thacker* encountered. Indeed, the officers in this case saw several persons leaving the home, which was exactly what the dispatcher had instructed the persons inside the house to do. There was no blood in the area or on any of the persons exiting the home, nor was there evidence of a struggle. Officer Severin admitted at the hearing on Cudworth's motion to suppress that when she informed the persons why the officers were present, "everyone stated [to the officers] that they had no idea what was going on." Appellee's App. at 47. Moreover, Coleman, when she was questioned by the officers, told them that there was not a man inside the house being held

at gunpoint, that no one was still inside the house, and that she had not seen anyone with a gun inside the house.[7]

In addition, unlike in *Thacker*, there was no need for the officers in this case to secure the residence so that paramedics could enter safely to treat an injured person inside. And the court in *Thacker* found it significant that the plaintiffs in that case had "solicited the response they received." 328 F.3d at 255. The officers here had no indication that someone inside the home had placed the 911 call. Therefore, we conclude that the trial court's reliance on *Thacker* is misplaced.

▆▆▆ As this court stated in *Harless*, 577 N.E.2d at 248, "Courts should take a very hard line against the search of a person's home without a warrant or consent; and, therefore, [courts should] demand a genuine showing of an emergency before they will excuse the police's failure to obtain a warrant." (Citing *United States v. Salgado*, 807 F.2d 603, 609 (7th Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)). And, again, while exigent circumstances justify dispensing with a search warrant, they do not eliminate the need for probable cause. *See id.* Rather, "[i]n validating a warrantless search based on the existence of an emergency, as with any other situation falling within the exigent circumstances exception, the Government must demonstrate both exigency and probable cause." *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir.2002), *cert. denied*, 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003). "[I]n an emergency, the probable cause element may be satisfied where the

---

7. The State did not present evidence disputing Coleman's testimony. Therefore, we must consider it in reviewing the trial court's ruling on Cudworth's motion to suppress. *See Overstreet*, 724 N.E.2d at 663 (stating unlike typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant).

officers reasonably believe a person is in danger." *Id.* at 1338.

In *Holloway,* the Court of Appeals for the Eleventh Circuit concluded that the government had proven both exigency and probable cause justifying the police's warrantless entry into the defendant's home. *See id.* at 1338. In that case, a police officer received a dispatch from a 911 operator to investigate an anonymous report of gunshots and arguing emanating from the defendant's residence. *See id.* at 1332. En route, the officer received a second dispatch which indicated the anonymous 911 caller had reported continued gunshots and arguing. When the officer arrived at the residence, he observed the defendant and his wife standing on the porch. The officer ordered them both to raise their hands, but the wife did not comply. The wife repeatedly refused the officer's orders, and at some point, the officer observed a child in the doorway of the residence. The child was ordered back inside the residence, and the officer eventually apprehended the wife.

At that point, the officer began walking toward the home to check for victims and weapons on the premises. He observed several beer cans strewn about the yard and porch. When the officer stepped on the porch, he observed shot gun shells and an 870 Remington shotgun leaning against the home with the safety disengaged. The officer then secured the weapon in his police vehicle and entered the home in search of victims and to investigate the disturbance. *See id.* at 1332–33. Based on those facts, the court rejected the defendant's Fourth Amendment challenge in relevant part as follows:

> [W]e conclude that the Alexander City police officers in this case did not violate the Fourth Amendment when they conducted a warrantless search of Appellant's home. Late into the evening on August 4, 1999, Officer Bernard received a dispatch from a 911 operator relaying a report of gunshots and arguing at Appellant's address. Immediately thereafter, he received a second dispatch indicating continued gunshots and arguing. Officer Bernard and Officer Billips promptly proceeded to the residence, arriving within minutes of the first dispatch. *Upon arrival, nothing at the mobile home dissuaded the officers from believing the veracity of the 911 calls. Rather, the presence of Appellant and his wife on the front porch supported the information conveyed by the 911 caller.* Under the circumstances known to them at that time, the officers reasonably believed an emergency situation justified a warrantless search of Appellant's home for victims of gunfire. The possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating [an] immediate search. Additionally, *based on the information conveyed by the 911 caller and the personal observations of the officers, there was probable cause to believe a person located at the residence was in danger.* Under the exigent circumstances exception to the Fourth Amendment, the officers were not required to obtain a warrant before entering Appellant's home.

*Id.* at 1338 (emphases added).

 Unlike in *Holloway,* in this case the State failed to prove either exigency or probable cause. First, Officers Briggs' and Severin's testimony concerning a prior arrest of persons inside the house and a one-month-old encounter with a person named "Louis" in no way corroborated the information contained in the anonymous 911 call. Similarly, any prior criminal activity committed by persons associated with the home does not support a determination of exigent circumstances. Again, the relevant inquiry is whether the govern-

ment has established that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance. *See Richardson,* 208 F.3d at 629. Just prior to the moment of entry in this case, the officers had observed several persons exit the home as they had been instructed to do by police dispatch. One of the persons who had been inside the home had informed the officers that there was not a man inside the house being held at gunpoint and that no one else was inside the home. The evidence also shows that those who had exited the house had no idea why the police had come.

Still, the State points out that the officers did not believe that Clements was trustworthy and thought that she was not being honest about the number of people inside her home when they questioned her. The State further points out that none of the persons who had exited the house were named Louis. But without more, we conclude that the officers' mere subjective belief that Clements may have been lying, combined with the fact that no one named Louis had exited the house, is insufficient to create exigency or probable cause. Our conclusion is bolstered by the fact that the officers were responding to an anonymous 911 call, which the State concedes lacked proof of reliability. *See Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (stating anonymous tips, without more, do not justify freewheeling police action). Additionally, unlike in both *Thacker* and *Holloway,* the officers observed nothing at Cudworth's home which corroborated the tip that someone was in need of immediate aid. In other words, the State failed to prove that the officers in this case possessed objective evidence that a violent crime had or was about to occur inside Cudworth's home. *See Bryant,* 660 N.E.2d at 301 (explaining

in cases employing exigent circumstances exception, police have possessed objective evidence that violent crime has or was about to occur).

In sum, the State failed to demonstrate either exigent circumstances or probable cause required to support a lawful warrantless search. Therefore, we hold that the officers' warrantless search of the home violated the Fourth Amendment, and the trial court erred when it denied Cudworth's motion to suppress the evidence.

 Admissions of evidence in violation of the Fourth Amendment are subject to harmless error analysis. *Smock,* 766 N.E.2d at 407. Harmless error occurs when the conviction is supported by substantial independent evidence of guilt which satisfies the reviewing court that there is no likelihood that the erroneously admitted evidence contributed to the conviction. *Id.* Violations of the Fourth Amendment must be harmless beyond a reasonable doubt. *Id.* We must find that there is no substantial likelihood the error contributed to the verdict, or, in other words, that the error was unimportant in relation to everything else before the jury on the issue in question. *Id.*

Here, the State does not argue that, even if the warrantless search violated the Fourth Amendment, the admission of the evidence recovered from Cudworth's home amounts to harmless error. Indeed, without that evidence, the State presented little if no evidence to support Cudworth's convictions. Therefore, we reverse and order the trial court to vacate his convictions.

Reversed.

SULLIVAN, J., and BARNES, J., concur.