# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JOHN ANDREW GOODRIDGE**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

FILED

Oct 02 2012, 9:28 am

*[signature]*

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MOISE JOSEPH, )<br><br>Appellant-Defendant, )<br><br>vs. )<br><br>STATE OF INDIANA, )<br><br>Appellee-Plaintiff. ) | No. 82A05-1108-CR-387 |

APPEAL FROM THE VANDERBURGH CIRCUIT COURT
The Honorable Carl A. Heldt, Judge
The Honorable Kelli E. Fink, Magistrate
Cause No. 82C01-1007-FA-869

**October 2, 2012**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

In the instant matter we are faced with the troublesome situation of reviewing an individual's convictions relating to an unspeakable crime in light of an apparent violation of the convicted individual's Fourth Amendment rights. In reviewing this matter, we must consider to what extent certain statements made by the convicted individual must be suppressed following an episode of police misconduct.

Appellant-Defendant Moise Joseph appeals following his convictions for Class A felony burglary resulting in serious bodily injury,[1] Class B felony attempted armed robbery,[2] and Class B felony criminal confinement.[3] In appealing his convictions, Joseph argues that the trial court abused its discretion in admitting certain statements that he made to a police detective during an interview that occurred following the illegal and warrantless entry into and search of his apartment by police officers. Concluding that the trial court abused its discretion in admitting Joseph's statements to the police detective, we reverse.

**FACTS AND PROCEDURAL HISTORY**[4]

At approximately 9:30 a.m. on July 16, 2010, police were called to a Sonic Drive-In in Evansville to investigate two suspicious vehicles. The vehicles were parked, with their license plates pointing away from the restaurant, in the area of the Sonic parking lot commonly used by restaurant staff. Evansville Police Officer Gerald Collins responded to

---

[1] Ind. Code § 35-43-2-1 (2010).

[2] Ind. Code § 35-42-5-1(1) (2010).

[3] Ind. Code §§ 35-42-3-3(a)(1) and 35-42-3-3(b)(2)(A) (2010).

[4] We heard oral argument in this matter on August 21, 2012, and wish to thank counsel for the high quality of their presentations.

2

the call. After arriving at the Sonic, Officer Collins ran the license plates on the vehicles and learned that neither vehicle had been reported stolen. During the course of running the vehicles' license plates, Officer Collins learned that one of the vehicles was registered to Joseph, and he was provided with Joseph's address. The vehicles remained in the Sonic parking lot until approximately 11:00 a.m., when three men returned and hurriedly drove them away.

Earlier that day, at approximately 7:30 a.m., Larry Matthew Moore and Heather Reeves left the residence Moore shared with his girlfriend, Megan Darr. Moore's home was located in Evansville near the Sonic. At some point during the morning, Darr was awakened when someone jumped on her in bed, wrapped a blanket around her head, and asked, "[W]here's the money at?". Tr. p. 372. When Darr attempted to break free, the person struck her on the head with a gun. Darr, who had recently learned that she was pregnant, became scared and had trouble breathing. At some point, Darr noticed that there were other people in the home. She also saw that the person on top of her was a black male and that he was, in fact, wielding a gun. Darr continued to struggle with the man who struck her several more times with the gun. The man told Darr that she should not struggle because his gun had "a hairy f'ing trigger." Tr. p. 376. Eventually, the man threw Darr on the floor, and after Darr pleaded with him to stop because she was pregnant, kicked her in the ribs, tied her up, and placed her in a closet with a blanket over her head.

Moore returned home, again with Reeves, at approximately 9:30 a.m. When Moore and Reeves returned to Moore's home, they encountered the three men who had invaded the

3

home. One of the men grabbed Reeves and pulled her into the home. Moore escaped and ran to a nearby business to call the police. After pulling Reeves inside, the three men fled the home. Police officers arrived at the home shortly thereafter. Darr was transported to the hospital for treatment. The home had been completely ransacked, and various items were missing.

Because of the timing of the invasion of Moore's home, the close proximity of the home to the Sonic, and his knowledge that Joseph had a gun permit, Evansville Police Officer Raymond Michael Winters went to the apartment complex where Joseph lived. Officer Winters acknowledged that, at the time, he did not know anything about the home invasion, except that there had been one. Officer Winters was joined at the apartment complex by other officers, including Officer Dan Hoehn. Officer Winters located the apartment complex manager, who let Officers Winters and Hoehn into Joseph's apartment. The officers handcuffed Joseph, read him his *Miranda*[5] advisements, and asked him about his whereabouts earlier that morning. After being told by the officers that they knew that his vehicle had been at the Sonic, Joseph indicated that he had been approached by two men about purchasing an X-Box gaming system for five dollars. During a search of Joseph's apartment, officers recovered guns and other items of interest relating to their investigation into the home invasion. However, it is unclear from the record whether any of these items were found to have any connection to the home invasion.

---

[5] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

After arriving on the scene, Evansville Police Detective Ron Brown asked Joseph, who was still handcuffed, whether he would be willing to go to the police station to answer a few questions. Joseph answered in the affirmative. Joseph was then transported to the police station by Officer Winters. Upon arriving at the police station, Detective Brown again read Joseph his *Miranda* advisements before questioning him about the evidence recovered from his home and his knowledge of the home invasion. Joseph repeated his earlier statement about the X-Box gaming system, but denied being involved in the home invasion.

On June 20, 2010, the State charged Joseph with Class A felony burglary resulting in bodily injury, Class B felony attempted armed robbery, and Class B felony criminal confinement. Joseph filed a motion to suppress all evidence recovered during the search of his apartment as well as his statements to Officers Winters and Hoehn and Detective Brown. Following a hearing, the trial court suppressed all evidence recovered from Joseph's apartment as well as his statements to Officers Winters and Hoehn. The trial court denied the motion with respect to Joseph's statements to Detective Brown. A jury trial commenced on April 11, 2011, after which the jury found Joseph guilty as charged. On July 1, 2011, the trial court sentenced Joseph to an aggregate term of twenty-six years of incarceration. This appeal follows.

**DISCUSSION AND DECISION**

Joseph contends that the trial court abused its discretion in admitting the statements that he made to Detective Brown following the warrantless entry into and search of his apartment by Officers Winters and Hoehn. Specifically, Joseph argues that his statements to

5

Detective Brown constitute "fruit of the poisonous tree" and, therefore, were inadmissible at

trial.[6]

## A. Standard of Review

> Our standard of review for rulings on the admissibility of evidence is
> essentially the same whether the challenge is made by a pre-trial motion to
> suppress or by an objection at trial. *Ackerman v. State*, 774 N.E.2d 970, 974-
> 75 (Ind. Ct. App. 2002), *reh'g denied*, *trans. denied*. We do not reweigh the
> evidence, and we consider conflicting evidence most favorable to the trial
> court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005),
> *trans. denied*. We also consider uncontroverted evidence in the defendant's
> favor. *Id*.

*Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007).

A trial court has broad discretion in ruling on the admissibility of evidence.

*Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citing *Bradshaw v. State*,

759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). Accordingly, we will reverse a trial court's

ruling on the admissibility of evidence only when the trial court abused its discretion. *Id*.

(citing *Bradshaw*, 759 N.E.2d at 273). An abuse of discretion involves a decision that is

clearly against the logic and effect of the facts and circumstances before the court. *Id*. (citing

*Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

## B. Analysis

### 1. The Fourth Amendment

On appeal, Joseph claims that the warrantless entry into and search of his apartment by

---

[6] On appeal, Joseph frames his argument as a challenge to the constitutionality of the warrantless entry
of his apartment under the Fourth Amendment to the United States Constitution. Joseph does not make a
separate argument under Article 1, Section 11 of the Indiana Constitution. As such, any claim of error under
the Indiana Constitution is consequently waived. *See Davis v. State*, 907 N.E.2d 1043, 1048 n.10 (Ind. Ct.
App. 2009).

Officers Winters and Hoehn violated the Fourth Amendment to the United States Constitution.

> The fundamental purpose of the Fourth Amendment to the United States Constitution is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings. *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). The principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment and, therefore, searches and seizures inside a home without a warrant are presumptively unreasonable. *Alspach v. State*, 755 N.E.2d 209, 212 (Ind. Ct. App. 2001), *trans. denied.* The State bears the burden of proving that a warrantless search falls within an exception to the warrant requirement. *Taylor*, 842 N.E.2d at 330. Whether a particular warrantless search violates the guarantees of the Fourth Amendment depends on the facts and circumstances of each case. *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008).

*Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010).

The existence of exigent circumstances falls within an exception to the warrant requirement. *Id.* (citing *Holder v. State*, 847 N.E.2d 930, 936 (Ind. 2006)). In other words, the warrant requirement becomes inapplicable when the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment. *Id.* (quotations omitted). Under the exigent circumstances exception, police may enter a residence without a warrant if the situation suggests a reasonable belief that someone inside the residence is in need of aid. *Id.* (citing *Smock v. State*, 766 N.E.2d 401, 404 (Ind. Ct. App. 2002)). However, an officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless entry. *Id.* (citing *Cudworth v. State*, 818 N.E.2d 133, 137 (Ind. Ct. App. 2004)). Rather, the test is objective, and the government must establish that the circumstances as they appear at the moment of

entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house required immediate assistance. *Id*. (citing *Cudworth*, 818 N.E.2d at 137).

"Moreover, 'while exigent circumstances justify dispensing with a search warrant, they do not eliminate the need for probable cause.'" *Id*. (quoting *Cudworth*, 818 N.E.2d at 137). The probable cause element may be satisfied where the officers reasonably believe that a person is in danger. *Id*. (citing *Cudworth*, 818 N.E.2d at 137). "'The burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.'" *Id*. at 579-80 (quoting *McDermott v. State*, 877 N.E.2d 467, 474 (Ind. Ct. App. 2007)).

Here, the State concedes that the warrantless entry into and search of Joseph's apartment by Officers Winters and Hoehn "may well have been without probable cause and therefore in violation of [Joseph's] rights under the Fourth Amendment." Appellee's Br. p. 8. Moreover, the State does not point to any exigent circumstances that it asserts would overcome the presumption of unreasonableness attached to Officer Winters's and Hoehn's warrantless entry into and search of Joseph's apartment. Thus, in light of the State's concession that Officers Winters and Hoehn lacked probable cause to search Joseph's apartment, together with its failure to point to any exigent circumstances sufficient to overcome the presumption of unreasonableness attached to the warrantless entry into and search of Joseph's apartment, we conclude that the warrantless entry into and search of Joseph's apartment violated Joseph's rights under the Fourth Amendment.

**2. The Exclusionary Rule and the Doctrine of Attenuation**

8

Having concluded that the search of Joseph's apartment violated Joseph's rights under the Fourth Amendment, we must next consider whether Joseph's comments to Detective Brown were sufficiently attenuated to dissipate any taint of the illegal search. "The exclusionary rule is a judicially created remedy designed to safeguard the right of the people to be free from 'unreasonable searches and seizures.'" *Trotter*, 933 N.E.2d at 581 (quoting *U.S. v. Calandra*, 414 U.S. 338, 348 (1974)). "The main purpose of the exclusionary rule 'is to deter future unlawful police conduct' and, thus, evidence obtained through an illegal search and seizure is inadmissible at trial." *Id*. (quoting *Calandra*, 414 U.S. at 347). While it is true that evidence stemming from an illegal arrest or entry may be excluded upon proper motion by the defendant, *see Snellgrove v. State*, 569 N.E.2d 337, 341 (Ind. 1991), this court has recognized that "[n]ot all evidence is fruit of the poisonous tree and subject to suppress simply because it would not have come to light but for illegal police activity." *State v. Foster*, 950 N.E.2d 760, 763 (Ind. Ct. App. 2011), *trans. denied*.

> Fourth Amendment jurisprudence has recognized an exception to the exclusionary rule in cases where the connection between the illegal police conduct and the subsequent discovery of evidence "become[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois*, 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring). Specifically, "[i]n some situations, the causal chain is sufficiently attenuated to dissipate any taint of [the illegal police activity], allowing the evidence seized during a search to be admitted." *Cole v. State*, 878 N.E.2d 882, 887 (Ind. Ct. App. 2007). This is known as the attenuation doctrine. *See Quinn v. State*, 792 N.E.2d 597, 601 (Ind. Ct. App. 2003) (citing *Brown*, 422 U.S. 590, 603-04, 95 S.Ct. 2254), *trans. denied*.

*Trotter*, 933 N.E.2d at 581. Put another way, attenuation simply means that the connection between the illegal police conduct and Joseph's statements has become so weakened in force,

9

intensity, and effect that the taint of the illegal police conduct has been dissipated. *See*

*Foster*, 950 N.E.2d at 762.

The State argues that despite the unconstitutional nature of Officers Winters's and Hoehn's entry into and search of Joseph's apartment, the trial court properly admitted Joseph's statements to Detective Brown pursuant to the doctrine of attenuation.

> Cases have established that three factors should be considered in determining whether the connection has become too weak: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See, e.g.*, *Turner v. State*, 862 N.E.2d 695, 701 (Ind. Ct. App. 2007). The important consideration in the third factor is whether the evidence came from the "'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" [*Quinn*, 792 N.E.2d at 600] (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

*Foster*, 950 N.E.2d at 763. It is also important to consider whether officers have given *Miranda* warnings to a defendant when determining whether the statement or confession was the product of an illegal arrest. *Snellgrove*, 569 N.E.2d at 341-42.

In *Snellgrove*, following a wave of armed robberies, police detectives entered Snellgrove's home without a warrant and arrested him and his fiancée. *Id*. at 339. Snellgrove was read his *Miranda* advisements and taken to the police station. *Id*. At the stationhouse, Snellgrove was again read his *Miranda* advisements. *Id*. Snellgrove indicated that he understood his rights and that he did not wish to speak to the detectives. *Id*. Eventually, Snellgrove was informed that his fiancée was cooperating with the detectives and was told what she had said to the detectives concerning the robberies. *Id*. Snellgrove subsequently told the detectives about his involvement in the robberies. *Id*. Snellgrove was

charged with and convicted of four counts of Class B felony armed robbery. *Id*. at 338. Snellgrove challenged the admissibility of his confession, claiming that it was derived from his illegal arrest. *Id*. at 339.

Upon review, the Indiana Supreme Court held that Snellgrove was correct in his assertion that his arrest was carried out in an unlawful manner. *Id*. at 340. In determining whether Snellgrove's subsequent confession was "fruit[] of such illegality[,]" the Court noted that prior to giving his confession, Snellgrove was read his *Miranda* advisements three times. *Id*. at 342. The Court determined that, based on the facts at issue, the illegal police activity did not rise to the level of purposeful or flagrant police misconduct because the police had probable cause to obtain a warrant for Snellgrove's arrest in connection to the robberies. *Id*.

As to the temporal proximity, the Court noted that this factor could be an ambiguous one. *Id*. The Court determined that the approximately four hours that elapsed between Snellgrove's arrest and his confession were such that "carries some small weight, certainly not decisive, tending to dissipate the taint of the illegality" and could be considered with the other factors. *Id*. The Court further determined that the record did not disclose the presence of significant intervening circumstances. *Id*. After balancing these factors, the Court concluded that Snellgrove's decision to confess was an act of his free will and not the product of his illegal arrest. *Id*. at 343.

In *Foster*, police detectives entered Foster's apartment without a warrant and handcuffed him. 950 N.E.2d at 761. One of the detectives read Foster his *Miranda* advisements and transported him to the police station. *Id*. While en route to the police

11

station, Foster made inculpatory statements. *Id*. At the station, he was again read his *Miranda* advisements. *Id*. Foster signed a waiver of his rights and submitted to questioning by the detectives, during which time he made additional inculpatory statements. *Id*. After questioning Foster, the detectives sought and obtained a warrant for his arrest. *Id*. Foster was charged with Class A felony dealing in cocaine. *Id*. Foster sought to suppress his statements as evidence that stemmed from his illegal arrest following the detectives' illegal entry into his apartment. *Id*.

Upon review, we noted that very little time lapsed between the arrest and the admissions made in the police car and at the police station, and that there is "little doubt that [defendant's] statements came from the exploitation of the unlawful arrest." *Id*. at 763. The State argued that the giving of *Miranda* advisements constituted a valid intervening circumstance. *Id*. We disagreed and concluded that, like in *Turner*, "'[g]iven the near-constant interaction between [the defendant] and the police that evening, we cannot say that the connection between the illegal [police activity] and [defendant's] confession had been attenuated sufficiently.'" *Id*. (quoting *Turner*, 862 N.E.2d at 702). We concluded that because the connection between the arrest and the securing of statements disclosed near constant interaction and exploitation of the arrest, a finding of attenuation was precluded, and as such, the trial court properly excluded Foster's statements to police. *Id*.

Here, the State concedes that Officers Winters and Hoehn entered into and searched Joseph's apartment without a warrant in violation of the Fourth Amendment. The State further concedes that unlike in *Snellgrove*, Officers Winters and Hoehn did not have probable

12

cause to believe that Joseph was involved in the home invasion when they entered into and searched his apartment. The record demonstrates that upon entering Joseph's apartment, Officers Winters and Hoehn read Joseph his *Miranda* advisements before speaking to Joseph. Officers Winters and Hoehn claim that Joseph agreed to go to the police station for questioning after he made an inculpatory statement regarding his whereabouts earlier that morning.[7] Upon arriving at the police station, Joseph was again read his *Miranda* advisements. Joseph gave a statement to Detective Brown regarding his actions that morning and denied any involvement in the home invasion. Joseph did not express any reluctance to speak with Officers Winters and Hoehn or Detective Brown.

Joseph claims that his statements to Detective Brown should be excluded because the statements were tainted by the illegal entry into and search of his apartment by Officers Winters and Hoehn. Specifically, Joseph claims that he remained handcuffed continuously from the first moment Officers Winters and Hoehn entered his home (with the exception of the few minutes that he was taken outside for a potential witness identification) and was soon thereafter transported to the police station. Detection Brown questioned Joseph about his prior statements to Officers Winters and Hoehn as well as certain pieces of evidence found in Joseph's apartment. By this time, Joseph argues that the "cat was already out of the bag." Appellant's App. p. 19. Joseph argues that the record is "woefully lacking" of any intervening circumstances upon which the trial court could have properly determined that his

---

[7] Again, this statement, like the evidence recovered from Joseph's apartment, was suppressed by the trial court and not admitted into evidence at trial.

decision to submit to an interrogation was an act of free will rather than the product of his illegal arrest. Thus, Joseph claims that the trial court abused its discretion in admitting his statement to Detective Brown into evidence at trial.

For its part, the State claims that Joseph's statements to Detective Brown were sufficiently attenuated to dissipate any taint of the illegal police activity.[8] In support, the State points out that like in *Snellgrove*, Joseph was read his *Miranda* advisements on multiple occasions following the illegal police entry into his apartment and before questioning by Detective Brown. The State cites to *Snellgrove* and asserts that, while not the only factor, the fact that Joseph was given his *Miranda* advisements is an important factor demonstrating that his statements were not the product of the illegal police conduct.

The State also points to the fact that approximately four hours had elapsed between the initial illegal entry and Joseph's statements to Detective Brown. The State acknowledges that the temporal proximity factor may be of minor significance, but notes that in *Snellgrove*, the Indiana Supreme Court held that while the temporal proximity factor is somewhat ambiguous and insignificant, the fact that the search occurred within four hours of the illegal conduct did not render the attenuation doctrine inapplicable. *See* 569 N.E.2d at 342. Further, while the State acknowledges that the warrantless entry into and search of Joseph's home by Officers Winters and Hoehn was illegal as it was in violation of the Fourth Amendment, the State claims that the fact that Joseph's statements were made at the police station rather than

---

[8] The State has not argued that the admission of Joseph's statements to Detective Brown was harmless.

14

at his home is an additional intervening circumstance that would tend to indicate that his statements were sufficiently attenuated from the illegal police conduct.

The record indicates that while Joseph was given his *Miranda* advisements at least two times and was transported to the police station prior to making his statements to Detective Brown, it also indicates that Joseph was in constant police custody from the time that Officers Winters and Hoehn initiated the illegal search of his apartment and was aware that their search had resulted in the discovery of potentially relevant evidence. Joseph was questioned about this evidence by both the officers at the scene and Detective Brown at the police station. In addition, nothing in the record indicates that Joseph had any way of knowing that the potential evidence found in his apartment and his statements to Officers Winters and Hoehn would later be suppressed from trial when he spoke to Detective Brown. Based on these facts, especially the fact that Joseph was in constant police custody from the time of their illegal entry into and search of his apartment, knew what potential evidence had been discovered in his apartment, and had made prior potentially incriminating statements to Officers Winters and Hoehn, we cannot conclude that Joseph's comments to Detective Brown were sufficiently attenuated from the illegal search of his apartment to dissipate any taint of the illegal police conduct. As such, we conclude that the trial court abused its discretion in admitting Joseph's statements to Detective Brown at trial.

The judgment of the trial court is reversed.

FRIEDLANDER, J., and BARNES, J., concur.

15